### THE JAMES J. HILL.

### BOWMAN v. RETZLAFF et al.
### Civil Action No. 2894.

District Court, D. Maryland.
April 4, 1946.

266

Ober, Williams & Stinson, of Baltimore, Md. (Robert W. Williams and William A. Grimes, both of Baltimore, Md.), for plaintiff.

Bernard J. Flynn, U. S. Atty., and C. Ross McKenrick, Asst. U. S. Atty., both of Baltimore, Md., and John T. Grigsby, Atty., Dept. of Justice, of Washington, D. C., for defendants.

CHESNUT, District Judge.

In this case the master of the SS "James J. Hill" seeks an injunction against the enforcement of an order of Gilbert A. Dailey, Collector of the Port of Baltimore, which required that 40,843 bushels of Canadian wheat theretofore provisionally entered for importation into the United States "must be exported, or destroyed, under custom supervision". The respondents are George T. Cromwell, Collector of Customs (successor to Gilbert A. Dailey) and Allen T. Retzlaff, Chief of the Baltimore Station Food and Drug Administration of Federal Security Agency. They have answered justifying the order under section 801 of the Federal Food, Drug, & Cosmetic Act of 1938, 21 U.S.C.A. § 381, which deals with imports and exports.

Section 381 (so far as here material) provides that the Secretary of the Treasury shall deliver to the Federal Security Administrator samples of food offered for import into the United States, giving notice thereof to the owner or the consignee "who may appear before the Federal Security Administrator and have the right to introduce testimony". If it is found that the article is "adulterated" "then such article shall be refused admission" and "unless such article is exported by the consignee within three months, it must be destroyed". By section 342(a) "food shall be deemed to be adulterated * * * (3) if it consists in whole or in part of any filthy, putrid, or *decomposed substance, or if it is otherwise unfit for food*". (Italics supplied)

The position of the respondents is that in due course they have administratively determined that the wheat was unfit for food. The complainant attacks this position on two grounds: (1) that there was no substantial evidence before the respondents that the wheat was unfit for food and that

their action is therefore arbitrary and capricious; and (2) that the Federal Security Administrator did not afford the plaintiff a fair hearing. Extended testimony was heard in court upon these issues and the case taken under advisement. After consideration I have reached the conclusion that the injunction applied for must be denied and the complaint dismissed.

I find the material facts to be as follows:

1. Prior to September 13, 1945, about 40,000 bushels of Canadian wheat were shipped by rail from Canada to Baltimore and there transshipped to the SS James J. Hill, a government owned vessel. The wheat was consigned to an agency of the French Government at Casablanca, Morocco. The "Hill" sailed from Baltimore on September 13, 1945. The next morning it was discovered that there were ten feet of water in No. 1 hold, where the wheat was stowed, by reason, as it was later found, of an influx of water through a plumbing fixture which ought to have been blocked off when the vessel was not being used as a troop-carrier but which had been opened while the vessel was in port. The "Hill" proceeded to Hampton Roads, Virginia, where it found sufficient port facilities unavailable and consequently returned to Baltimore, arriving September 16, 1945. Discharge of all grain from the watered hold was immediately undertaken and the grain was entered at the Custom House at Baltimore by John F. Connor, a broker acting on behalf of the owner of the grain.

2. On September 24, 1945, the Collector of Customs served on Connor an order requiring the wheat to be held intact pending analysis of samples and advising that failure of the goods to comply with the requirements of the Food and Drug Act would result in an order for its exportation or destruction. The next day the Chief of the Baltimore Station Food & Drug Administration notified Connor in writing that inspection and analysis of the samples showed the wheat to be adulterated within the meaning of section 402(a) of the Food, Drug, & Cosmetic Act, 21 U.S. C.A. § 342(a) since it consisted in whole or in part of a filthy, putrid or decomposed substance, or was otherwise unfit for food. "Product is water damaged; grains hot and sour". The notice fixed a hearing date three days later "at which time and place you may be present and submit testimony, or at or before which time you may file a statement in writing".

3. It seems to have been conceded at that hearing as at the hearing in this court that the wheat in its then condition was unfit for importation. On September 27, 1946, Connor made application for the release of 5,000 bags of wheat found to be undamaged by water and also for permission to re-condition the damaged wheat by blowing, cleaning and drying and thus stopping further decomposition and deterioration. This permission was granted but with the following condition: "However, before issuing conditional release providing for final re-conditioning and disposition of the damaged wheat it must be clearly understood just how you plan to accomplish this, for which purpose we are enclosing another blank application in duplicate. On receipt of this application stating the purpose to which the wheat is to be put after re-conditioning and also outlining the method to be used in re-conditioning, we shall issue the conditional release".

4. Regulations have been published for administration of the Act. No. 2.309 provides for relabelling or re-conditioning an article to bring it within compliance with the Act. It provides that the owner or consignee may make request in writing for such re-conditioning or other action to render the article not a food within the meaning of the Act. "Such request shall propose the labelling to be used and any other act to be done for such purpose and shall specify the time and place when such labelling or other act is to be done". If and when it has been done and in its changed condition approved by the Administrator the article may be released from detention.

5. It appears that the owner or consignee in this case did not make formal written application but did informally and by correspondence with the Administrator request the release of the wheat, then in process of being dried out, for use as poultry food, and submitting an offer for the purchase of the dried wheat from a dealer in poultry foods on November 16, 1945; and on November 27, 1945 attorneys for the owner requested a hearing by the Administrator with an opportunity to submit testimony "as to the present condition of the damaged wheat, and particularly on the question of the fitness of said wheat for animal food;" and stating that they had consulted the Department of Poultry Husbandry at the University of Maryland,

College Park, Maryland, and submitted samples of the re-conditioned grain in order that it could be carefully examined and tested to determine its availability as poultry food; and that this proposed test would cover a period of two or three weeks at which time the results of the test would be submitted. The Administrator replied on November 30, 1945 that a hearing under the Act had already been given and that the request for the use of the wheat as poultry feed was denied and declining to accept the invitation to participate in the controlled feeding tests.

6. On December 11, 1945 the Collector of Customs passed the formal order for the destruction or exportation of the damaged wheat to be complied with in three months. The notice stated "part of the lot has been dried since detention. Examination of the dried portion of this lot indicates it to be unfit for food of any kind. Undried portion is decomposed or hot and sour".

7. Some further informal negotiations or consultation ensued between the parties with a final letter from Mr. L. D. Elliott, Assistant Commissioner of Food and Drugs at Washington, dated January 9, 1946, which stated in part:

"As was further pointed out to him (Mr. Robert Williams, attorney for the owners) this Administration cannot agree to the release of this damaged grain for poultry feed purposes irrespective of the outcome of the experiments you plan, nor are we in a position to participate in them. It has been our consistent policy to refuse to acquiesce in the use of moldy material in poultry feed in connection with salvage operations under the seizure section of the Act as well as under its import provisions. This policy is based upon the consensus of opinion among the authorities in the field of Veterinary Medicine who cannot assure us that the feeding of moldy material to poultry would be free of any possibility of adversely affecting the health of the birds. The outcome of any brief tests using some part of the 40,000 bushels involved here would not alter the applicability of our policy based on the consensus above. We have no disposition to close the door to the consideration of any proposals you may wish to make for some other use of this material which will in no way jeopardize public interests. * * * Although there is no provision for an appeal under the import regulations of the Act, you are of course welcome to call at the Administration at any time for a discussion of your problem in connection with the proper disposal of this grain, having in mind the time limit prescribed by the order above."

8. At the hearing in court the respective parties submitted interesting scientific testimony with respect to the suitability of the dried out grain for use as poultry feed. It was not controverted that the water damaged grain before being dried out was unsuitable for either human or animal food. Dr. Briggs, an expert poultry nutritionist at the University of Maryland testified to the results of experiments over a period of three weeks on chickens and baby chicks to which portions of the dried wheat had been fed. He said the chickens had thrived on the wheat which was mixed with other food, and expressed his opinion that it could be safely used generally for poultry feed. Dr. J. H. Brown, Assistant Professor of Bacteriology at the Johns Hopkins University, an expert in his field, after giving extended testimony upon the general subject expressed the opinion that any danger to the poultry from the use of the dried wheat would be "remote". On the other hand, witnesses for the respondents, and particularly Dr. Elliott, Assistant Commissioner of Food & Drugs, also an expert upon the subject, after likewise detailed testimony expressed the opinion that the danger was more than remote. The practical viewpoint upon the subject was expressed by the witness Rieck, extensively engaged in poultry farming on the Eastern Shore of Maryland. He said that in his business he would not take the chance of loss and damage to growing chickens by the use of such damaged wheat, as the saving in cost for the food would not justify the risk of damage that might occur.

The scientific testimony was to the effect that not all moldy material was necessarily injurious to health. As for instance, the drug penicillin is itself a mold. Various articles of cheese are to some extent decomposed or moldy and are yet edible. But the particular contention of the respondents is that this particular damaged wheat contained a certain amount of aspergillus mold which is generally recognized by standard authorities to be damaging to chickens if the spores are inhaled. Dr. Brown thought it quite unlikely that there would be any such inhalation in the ordinary way in which the wheat mixed with

other articles is fed to poultry; but experts for the respondents were of a contrary opinion.

On these facts the plaintiff contends that the administrative action was arbitrary and capricious and should be enjoined. Consideration of this contention must be related to the particular situation giving rise to the controversy. If the order of the Collector for exportation or destruction was not within the grant of statutory power it should of course be enjoined, even though the statute does not provide for judicial review. Waite v. Macy, 246 U.S. 606, 38 S.Ct. 395, 62 L.Ed. 892; Hannegan, Postmaster General, v. Esquire, Inc., 66 S.Ct. 456. By section 381 the Collector of Customs was authorized to refuse admission if the article was "adulterated". By section 342(a) "food shall be deemed to be adulterated * * * (3) if it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food". We may put aside in this case the words filthy and putrid, but it is the contention of the government that the damaged wheat was decomposed and otherwise unfit for food. There was substantial evidence, and indeed it is not disputed by the plaintiff, that there was some decomposition in the wet wheat and to some extent at least it was fermented and moldy. The evidence is in conflict as to the extent of this fermentation and also in conflict as to whether the drying of the grain had arrested or merely retarded the process of fermentation. The ultimate question here is, I think, whether the decomposition was so extensive as to render the grain unfit for food. A. O. Andersen & Co. v. United States, 9 Cir., 284 F. 542, 544; United States v. 200 Cases of Catsup, D.C., 211 F. 780.

And it is important here to distinguish between the condition of the grain when first offered for importation, and its condition after it had been dried. And it is also very important in this connection to note that there is really no controversy between the parties whether the wet grain before the drying was unfit for food of any kind, animal or human. In its original wet condition it was practically conceded that it was so unfit for any kind of food. The controversy as to its fitness for food is thus limited to the question as to whether after being dried it was fit for poultry feed. And here again on the evidence in the case taken in court the expert testimony was fairly evenly balanced. In my opinion, therefore, it cannot be said that the determination of the Food Administrator is not supported by substantial evidence. The plaintiff's particular contention to the contrary is that the decision of the Administrator was based on only a so-called organoleptic test, that is, by appearance, taste, texture, solubility, viscosity and color. See Knapp v. Calloway, D.C.N.Y., 52 F.2d 476, 477. It may be noted, however, that subsequently and in preparation for trial of the case in court, the Food Administrator had expert bacteriological examinations made and submitted evidence therefrom tending to support his decision based on the previous organoleptic tests.

It is also very important in this case to note that the administrative action was taken in the field of *importation* in which the power of Congress is *exclusive and absolute*. Buttfield v. Stranahan, 192 U.S. 470, 493, 24 S.Ct. 349, 48 L.Ed. 525. The rights of the importer are, therefore, only those given in the Act of Congress in this case, 21 U.S.C.A. § 381. And it will be noted that the statute itself deals only with the condition of the article when first offered for importation and its admission or rejection is to be determined by the Collector of Customs on the basis of advice from the Federal Security Administrator whether the samples show that the article offered for import is adulterated. In this case the Administrator did advise the Collector that the article was adulterated (within the meaning of the Act) and it is therefore clear enough that the Collector was authorized to refuse admission to the wheat in its originally tendered condition.

The plaintiff does not contend to the contrary but bases its present position on subsection (b) of section 381 and on a regulation (2.309) providing under some circumstances for the reconditioning of the article offered for import in order to bring it within compliance with the Act, or to take such action as may be necessary to render it not a food product. Section 381 (b) provides that the Secretary of the Treasury may deliver the article to the consignee "pending examination and decision in the matter on execution of a bond". Section 2.309 of the regulations provides that the owner may request the Food Administrator in writing to permit the relabelling or other act with respect to the article necessary to bring it into compliance with

the provisions of the Act or to render it not a food and "such request shall propose the labelling to be used and any other act to be done for such purpose, and shall specify the time and place at which such proposed labelling or other act is to be done".

As we have seen, the Secretary, acting through the Collector, did permit delivery of the grain to the owner before passing his final order of December 11, 1945; but this was only for the limited purpose of drying the grain to prevent further spoilage. And thereafter the owner did not formally request permission to do anything with the grain (except dry it) to render it not a food. Instead thereof what the owner did request was permission to sell the dried grain as poultry feed. · And this the Administrator refused to permit because in his expert opinion, based on generally accepted standards and information, it would not be safe for poultry growers to use even the dried grain for chicken feed. It is this action of the Food Administrator that is here attacked as arbitrary and capricious. As I have said, the scientific question presented is a nicely balanced one not free from doubt, but I conclude that the decision of the Food Administrator was not arbitrary or capricious. The plaintiff contends that it should be regarded as arbitrary and capricious because on the evidence injurious effects in poultry raising from the use of this damaged grain are not certain but only possible or conjectural. But I cannot accept this view as established by the preponderance of the evidence, and in any event it is my opinion that the decision of the Food Administrator on the basis of present scientific knowledge on the subject was not arbitrary or capricious. ·

■ Plaintiff also contends that under the evidence the Administrator did not accord him a fair hearing on this question. As heretofore stated, we are dealing with a subject matter of importation into the United States of articles where the power of Congress is absolute and the rights accorded the importer are only those given by the statute. The statute (section 381) accords a hearing only after notice to the importer with respect to the samples taken from the bulk of the commodity to determine whether it is properly importable. At the hearing upon notice the only right accorded to the importer is "to introduce testimony". Presumably this testimony should be relevant to whether the samples are fairly illustrative of the bulk product, and if so whether the bulk product is properly importable. In the particular case the notice was duly given and the opportunity was afforded the importer to introduce testimony at the appointed time and place. Apparently the right was waived because it was practically conceded that the samples were fairly taken and the bulk product in its then condition was not importable under the Act. The plaintiff's complaint here is not lack of a fair hearing with regard to the samples of the wet grain but to the refusal of the Food Administrator to give a further hearing with respect to the availability of the dried grain for use as poultry feed. The statute does not provide for such a further hearing. Indeed the provision of the regulation referred to is not expressly provided for in the statute itself; but it is in the nature of an act of grace to the importer to recondition the article so that it will not be violate of the Act as a food product but may be used for other proper purposes not inconsistent with the Act, and thus possibly avoid unnecessary monetary loss.

■ It is also to be noted that the statute does not provide for judicial review. In this respect the procedure under section 381 is quite different from that taken under other sections of the Food, Drug, and Cosmetic Act of 1938 relating to domestic commerce, where proceedings for condemnation require judicial procedure. And section 381 as it now stands is an amendment of the prior Act of 1906, 21 U.S.C.A. § 14, in relation to importations, which also required judicial procedure for condemnation. See Ambruster v. Mellon, 59 App.D.C. 341, 41 F.2d 430, where it was held, under the earlier Act, that the action of the Secretary of the Treasury in admitting a certain importation was not subject to judicial review unless capricious or arbitrary. While there is no recorded case of an attack on the Secretary's action under the new Act, it is clear that in the present case the statute makes no provision for judicial review and creates no personal federal rights as the basis for judicial review, so long as the Secretary acted within the scope of his authority under the Act. See Stark v. Wickard, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733.

■ We must also bear in mind that the case does not present a question of

confiscation by the government of a property right. Indeed the order here sought to be enjoined is merely in the alternative, that is, for exportation or destruction within three months. That period has now passed, but it was understood at the hearing here that the damaged wheat would not be destroyed pending decision of this case. And it appeared further in the evidence that the Administrator was still willing to consider any reasonable proposal from the importer to allow importation of the wheat if effective measures could be taken to use it for purposes other than food. It appears that the importer had an offer for the purchase of the remainder of the dried wheat (about 32,000 bushels) at the price of $1.40 per bushel for use as poultry feed, and also another provisional offer for the wheat at $1.00 per bushel for use for purposes other than a food product.

On the whole case I conclude that the complaint must be dismissed with taxable court costs allowed to the defendants. Counsel may present the appropriate order in due course.