Harry SUGARMAN, Petitioner,

v.

Jack B. FORBRAGD, Fred E. Norman,
Food and Drug Officers, Respondents.

No. 46817.

United States District Court
N. D. California.

May 11, 1967.

George A. McKray, San Francisco, Cal., for petitioner.

Cecil F. Poole, U. S. Atty., Robert N. Ensign, Asst. U. S. Atty., San Francisco, Cal., Arthur A. Dickerman, Atty., Dept. of Health, Education and Welfare, Los Angeles, Cal. (of counsel) for defendants.

## MEMORANDUM OPINION

ZIRPOLI, District Judge.

This matter has been submitted to the Court on Respondents' Motion to Dismiss and their alternative Motion for Summary Judgment and on Petitioner's Motion for Summary Judgment. These motions are founded upon the pleadings, records, and files in this cause, which reflect the facts hereinafter set forth.

### Statement of Facts

On July 20, 1966, a Consumption Entry was filed with the Bureau of Customs in San Francisco on behalf of the Petitioner offering for import 3,394 sacks of "green coffee" from Colombia, weighing 475,160 pounds, with an "invoice and entered value" of $40,388.60. [Def. Exh. 1D].* A specimen of these "green coffee" beans is before the Court. [Def. Exh. 1A].

These coffee beans were being transported from Colombia to Japan when a fire aboard the ship MS Gunhild Torm required the Captain to change his course and enter a distress port at Long Beach, California. The details as to the extent and duration of the fire, as well as the techniques that were necessary to control it, are set forth in the affidavits of Captain J. S. Parry [Def. Exh. 2], Fire Battalion Chief William J. Patterson [Def. Exh. 3], and Assistant Fire Chief J. H. Montgomery [Def. Exh. 4], together with the exhibits attached to their affidavits.

On March 17, 1966, the ship left Colombia. The coffee in question was stored in Lower Cargo Hold No. 4. That same evening a fire broke out in Hold No. 4. During the period from March 17 through March 23, the ship was at sea

* Respondents' exhibits have herein been marked and designated as Defendants' exhibits and will hereinafter be so designated.

and the extensive but unsuccessful efforts to extinguish the fire are described in the "Abstract of Engine Log" [Def. Exh. 2D] and the "Abstract of Ship's Log" [Def. Exh. 2E].

On March 23, 1966, representatives of the Long Beach Fire Department met the vessel at the entrance to the Port of Long Beach to inspect the fire area and to plan a strategy for dealing with this emergency. The details of the fire-fighting problems and techniques are set forth in Training Bulletin No. 13 of the Long Beach Fire Department [Def. Exh. 3A, pp. 2–5]. The coffee had been stored in Lower Hold No. 4 together with a cargo of cotton and other merchandise, and it was the conclusion of the Fire Department that the fire had started within the cotton cargo deep in the lower hold [Def. Exh. 3A, p. 5]. In fighting the fire, the firemen used carbon dioxide, fresh water, harbor sea water, and fresh water wetted with Solvoid, and when the heat and smoke built up to a point where the fire could not be controlled through other techniques, the hold was flooded with fresh water and salt water [Def. Exh. 3A, pp. 3–5, and Def. Exh. 4].

The unloading of the coffee began on March 28 and was completed by April 3. The bags of coffee were torn, ripped, and split at the seams due to the swelling of the cargo and the coffee beans were therefore unloaded in bulk, commingled with other cargo; at that time the coffee beans were blackened, heated, and in a steaming condition. [Def. Exhs. 2B, p. 6, and 2C, p. 1]. After the coffee had been unloaded on an area adjacent to the dock, it stayed there for approximately one week, when it was necessary to flood it with water because of spontaneous heating and smoking throughout most of the pile; the coffee emitted a pungent and disagreeable odor [Def. Exh. 4].

On April 11, 1966, Petitioner Sugarman, together with three other joint venturers, purchased "the damaged coffee beans for salvage" for the sum of $600. [Def. Exh. 5]. The coffee beans were then transported to Turlock, California, where they were "cleaned" and sacked and thereafter offered for import [Def. Exhs. 5 and 1D].

On July 21, 1966, the Food and Drug Administration obtained a sample of these coffee beans. On August 2, a laboratory analysis of these coffee beans showed that the coffee beans were black on the surface and when cut in half were black throughout; the black beans left a black residue on the hands after examination; the odor of the beans was not normal, being suggestive of smoke or tar; and the flavor of the beans was not normal, lacking the characteristic taste of green coffee beans. [Def. Exh. 1E].

On August 8, 1966, a further examination of these coffee beans was made in Washington, D. C., by the Chief of Food Technology in the Bureau of Science of the Food and Drug Administration. He made two beverages from these beans. One beverage was derived from grinding the beans "as is" and brewing them. This beverage had a slight smoky odor and flavor and a very slight odor and flavor of green coffee. The second beverage was obtained by roasting these coffee beans and then grinding and brewing. The second beverage was nearly devoid of any coffee flavor and had a toasted flavor; the color of the beverage was very light, similar to light black tea beverage. [Def. Exh. 1F].

On August 18, 1966, Respondent Norman issued a Notice of Detention and Hearing on behalf of the Food and Drug Administration [Pet. Exh. A1]. This Notice indicates the agency conclusion that the product is adulterated in that "the article is unfit for food, since beverage made from it after roasting is nearly devoid of flaver and color characteristics of normal coffee." The Notice also indicates that the owner or consignee may introduce testimony at a hearing relative to the admissibility of the article or to the manner in which the article can be brought into compliance with the Act.

A number of conferences and considerable correspondence then ensued between the Petitioner and representatives of the Food and Drug Administration. On January 6, 1967, a hearing was held pursuant to the above Notice. [Pet. Exh. I-1].

On January 27, 1967, Petitioner submitted an "Application for Authorization" to the Food and Drug Administration at San Francisco, requesting permission to sell these coffee beans "for use in blended or soluble coffee." [Pet. Exh. K].

On February 1, 1967, conditional approval was granted which would permit entry of the coffee beans "to be used only for the extraction of caffeine or for the production of soluble coffee." Other conditions were also attached which would require that the Food and Drug Administration examine the finished product prior to release. [Pet. Exh. L].

On February 15, 1967, Petitioner submitted another "Application for Authorization" to sell the reconditioned beans to coffee roasters "for final processing as blended coffee." [Pet. Exh. M]. Petitioner also stated that he would try to find a buyer who would use these beans solely for the production of soluble coffee and requested an opportunity to prepare samples on a pilot scale for such purpose.

On March 30, 1967, Respondent Forbragd wrote to the attorney for the Petitioner, incorporating verbatim the following letter which Mr. Forbragd had received from the Food and Drug Administration in Washington, D. C. [Def. Exh. 1G]:

"We agree that the claimant's proposal to salvage this article under detention by grinding and blending it with other ground coffee is completely unacceptable, since this would amount to nothing more than diluting a legal article of food with an article which is unfit for food to make a low grade finished product.

Although you have approved the claimant's application to attempt to salvage a portion of this article either by extracting the caffeine or by processing into soluble coffee, we doubt that a satisfactory soluble coffee can be produced. Should the claimant desire to make a pilot run and submit samples for examination by DFSA, we will be glad to advise him about the acceptability of the soluble coffee. If this coffee is to be utilized in making soluble coffee the firm should not blend this with other coffee beans to prepare the soluble coffee.

The proposal to extract caffeine appears more likely to result in an acceptable finished product."

Respondents submitted a specimen of the coffee beans in question [Def. Exh. 1A], a specimen of normal green coffee beans from Colombia [Def. Exh. 1B], a specimen of normal roasted coffee beans from Colombia [Def. Exh. 1C], and a specimen of the coffee beans in question after roasting [Def. Exh. 1H].

On March 31, 1967, Petitioner filed a Petition for Writ of Mandatory Injunction alleging a "prejudicial abuse of discretion" in that the basis for Respondents' decision on Petitioner's "Application for Authorization" was not confined to the "record of hearing," and praying for the issuance of a Peremptory Writ ordering Respondents to approve Petitioner's application.

On April 19, 1967, Respondents filed a Motion to Dismiss and an Alternative Motion for Summary Judgment, with supporting affidavits and exhibits, asserting (1) the Court lacks jurisdiction over the subject matter, (2) the Petition fails to state a claim upon which relief can be granted, and (3) Respondents are entitled to summary judgment as a matter of law.

On April 20, 1967, Petitioner filed a Motion for Summary Judgment in favor of Petitioner and against Respondents as prayed in the Petition for Writ of Mandatory Injunction.

*Statutory Provisions*

*Administrative Procedure Act* [1]—*Judicial Review*

*5 U.S.C. § 701 [formerly 1009]. Application * * ***

(a) This chapter applies, according to the provisions thereof, except to the extent that—

(1) statutes preclude judicial review; or

(2) agency action is committed to agency discretion by law.

*Federal Food, Drug, and Cosmetic Act*

*21 U.S.C. § 381. Imports and exports * * ***

(a) The Secretary of the Treasury shall deliver to the Secretary of Health, Education, and Welfare, upon his request, samples of food, drugs, devices, and cosmetics which are being imported or offered for import into the United States, giving notice thereof to the owner or consignee, who may appear before the Secretary of Health, Education, and Welfare and have the right to introduce testimony. * * * *If it appears from the examination of such samples or otherwise that * * * (3) such article is adulterated,* misbranded, or in violation of section 355 of this title, *then such article shall be refused admission,* except as provided in subsection (b) of this section. The Secretary of the Treasury shall cause the destruction of any such article refused admission unless such article is exported, under regulations prescribed by the Secretary of the Treasury, within ninety days of the date of notice of such refusal or within such additional time as may be permitted pursuant to such regulations. * * *

(b) * * * If it appears to the Secretary of Health, Education, and Welfare that an article included within the provisions of clause (3) of subsection (a) of this section can, by relabeling or other action, be brought into compliance with this chapter or rendered other than a food, drug, device, or cosmetic, final determination as to admission of such article may be deferred and, upon filing of timely written application by the owner or consignee and the execution by him of a bond as provided in the preceding provisions of this subsection, the Secretary of Health, Education, and Welfare may, in accordance with regulations, authorize the applicant to perform such relabeling or other action specified in such authorization (including destruction or export of rejected articles or portions thereof, as may be specified in the Secretary's authorization) * * * [Emphasis added]

*21 U.S.C. § 342. Adulterated food*

A food shall be deemed to be adulterated—

(a) * * * (3) if it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food * * *

*Regulations*

*Title 21, Code of Federal Regulations*
*§ 1.318 Hearing*

(a) If it appears that the article may be subject to refusal of admission, the district director shall give the owner or consignee a written notice to that effect, stating the reasons therefor. The notice shall specify a place and a period of time during which the owner or consignee shall have an opportunity to introduce testi-

---

1. The Administrative Procedure Act was revised in language and recodified on September 6, 1966, together with other laws relating to Government Organization and Employees. [80 Stat. 378]. For convenience, and because the language changes apparently were not intended to effect substantive changes, the Court continues to refer to the "Administrative Procedure Act" in this opinion. Statutory quotations are taken from the revision, but both the new and the old citations are given.

mony. * '* * Such testimony shall be confined to matters relevant to the admissibility of the article, and may be introduced orally or in writing.

(b) If such owner or consignee submits or indicates his intention to submit an application for authorization to relabel or perform other action to bring the article into compliance with the act or to render it other than a food, drug, device, or cosmetic, such testimony shall include evidence in support of such application. * * *

### § 1.319 Application for authorization

Application for authorization to relabel or perform other action to bring the article into compliance with the act or to render it other than a food, drug, device or cosmetic may be filed only by the owner or consignee, and shall:

(a) Contain detailed proposals for bringing the article into compliance with the act or rendering it other than a food, drug, device or cosmetic.

(b) Specify the time and place where such operations will be carried out and the approximate time for their completion.

### § 1.320 Granting of authorization

(a) When authorization contemplated by § 1.319 is granted, the district director shall notify the applicant in writing, specifying:

(1) The procedure to be followed;

(2) The disposition of the rejected articles or portions thereof;

(3) That the operations are to be carried out under the supervision of an officer of the Food and Drug Administration or the Bureau of Customs, as the case may be;

(4) A time limit, reasonable in the light of the circumstances, for completion of the operations; and

(5) Such other conditions as are necessary to maintain adequate supervision and control over the article.

(b) Upon receipt of a written request for extension of time to complete such operations, containing reasonable grounds therefor, the district director may grant such additional time as he deems necessary.

*Agency action which is "committed to agency discretion by law" is not subject to review under the Administrative Procedure Act*

Petitioner erroneously assumes that this Court has jurisdiction to review the agency action in question by reason of the Administrative Procedure Act, specifically 5 U.S.C. § 701, formerly 1009. But that Act is not a blanket grant of jurisdiction to the Federal District Courts to review all agency actions. As the statute recites, no review is available where statutes preclude judicial review or where "agency action is committed to agency discretion by law." [5 U.S.C. § 701, formerly 1009]. The latter exception, which is applicable here, has been the subject of authoritative scrutiny.

A leading case in this area is Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958). There Grace Line sought to compel Panama Canal Co. to prescribe new tolls for use of the Canal and to refund certain tolls. The agency action was held not reviewable. On pages 317 and 318, 78 S.Ct. on page 757, the Court said:

Section 10 of the Administrative Procedure Act * * * excludes from the categories of cases subject to judicial review "agency action" that is "by law committed to agency discretion." We think the initiation of a proceeding for readjustment of the tolls of the Panama Canal is a matter that Congress has left to the discretion of the Panama Canal Co. * * * It is "authorized" to prescribe tolls and to change them. * * * But *the exercise of that authority is far more than the performance of a ministerial act.* * * * These are matters on which experts may disagree; they involve nice issues of judgment and

choice * * * which *require the exercise of informed discretion.* * * The case is, therefore, quite unlike the situation where a statute creates a duty to act and an equity court is asked to compel the agency to take the prescribed action. * * * We put the matter that way since the relief sought in this action is to compel petitioner to fix new tolls. *The principle at stake is no different than if mandamus were sought—a remedy long restricted* * * * *in the main, to situations where ministerial duties of a nondiscretionary nature are involved.* Where the matter is peradventure clear, where the agency is clearly derelict in failing to act, where the inaction or action turns on a mistake of law, then judicial relief is often available. * * * But *where the duty to act turns on matters of doubtful or highly debatable inference from large or loose statutory terms, the very construction of the statute is a distinct and profound exercise of discretion.* * * * We then must infer that the decision to act or not to act is left to the expertise of the agency burdened with the responsibility for decision. [Emphasis added]

See also Ferry v. Udall, 336 F.2d 706, 711–712 (C.A.9, 1964), cert. den. 381 U.S. 904, 85 S.Ct. 1449, 14 L.Ed.2d 286; Hamel v. Nelson, 226 F.Supp. 96, 97–99 (N.D.Calif., 1963); Chernock v. Gardner, 360 F.2d 257, 259 (C.A. 3, 1966); Community National Bank of Pontiac v. Gidney, 192 F.Supp. 514, 517 (E.D. Mich., 1961).

■ Whether agency action is "committed to agency discretion by law" so as to preclude judicial review clearly calls for consideration of the statute under which the action is taken, its language and purpose, the nature of the activity regulated, and ultimately a determination whether the agency is called upon to perform a mere ministerial act or to exercise an informed discretion.

*Admissibility of imports subject to the Federal Food, Drug, and Cosmetic Act is "committed to agency discretion by law"*

■ The Federal Food, Drug, and Cosmetic Act is a comprehensive measure designed to regulate all interstate and foreign commerce in foods, drugs, devices, and cosmetics. Its language was carefully drawn to deal with many different problems affecting producers, distributors, purchasers, and consumers of these products. In a concurring opinion in United States v. Sullivan, 332 U.S. 689, at page 699, 68 S.Ct. 331, at page 337, 92 L.Ed. 297 (1948), Justice Rutledge said of this enactment:

The Act is long and complicated. Its numerous provisions treat the very different subjects of drugs, food and cosmetics alike in some respects, differently in others. *The differences are as important as the similarities, and cannot be ignored.* [Emphasis added]

In a like manner, it may be said that Congress has set up procedures with respect to *imports* which are strikingly different from procedures regulating products of *domestic origin.*

Thus a food of domestic origin which *is* adulterated is subject to seizure and condemnation through the judicial process; the owner is entitled to a jury trial; and the Government must prove that the food *is in fact* adulterated. [21 U.S.C. §§ 334(a) (1), 334(b), 342].

■■ With respect to a food offered for import, samples may be obtained by the Secretary of Health, Education, and Welfare. [21 U.S.C. § 381(a)]. When a sample is taken, notice is given to the owner or consignee "who may appear before the Secretary * * * and have the right to introduce testimony." The *Secretary* is *directed* to refuse admission of such food—

if it *appears* from the examination of such samples or otherwise that * * * such article is adulterated * * * [21 U.S.C. § 381(a)]

Thus the mere *appearance of adulteration* is enough to compel refusal to admit. There is no requirement that the food actually be adulterated or that the Secretary find, as a fact, that the food is adulterated. Nor is the Secretary directed to rely upon testimony offered at the hearing. On the contrary, his conclusion that the food "appears" to be adulterated may derive *"from the examination of such samples or otherwise."* There is no provision for judicial review. Clearly, this is an instance where "agency action is committed to agency discretion by law."

■ The purpose of the hearing under 21 U.S.C. § 381(a) is to permit *the owner or consignee* to introduce testimony to show (1) that the food is admissible "as is" or (2) that the food is susceptible of being brought into compliance with the law.[2] [See 21 CFR 1.318–1.320]. Neither the statute nor the regulation contemplates that testimony will be offered at the hearing on behalf of the Secretary and none was offered in this case. Whatever testimony is offered by the owner or consignee at the hearing has no mandatory or limiting effect upon the Secretary, since by statute his determination is reached "from the examination of such samples or otherwise." In fact, the hearing is usually informal and without a court stenographer present. [Pet. Exh. I–1, pp. 53–54]. In this case, the Petitioner brought his own court reporter to the hearing.

In contrast to the informal hearing contemplated by 21 U.S.C. § 381(a), other provisions of the Federal Food, Drug, and Cosmetic Act prescribe detailed procedures for formal administrative hearings, transcription of record, findings, and a statutory right of judicial review.

[See "new drug" hearings, 21 U.S.C. § 355(d)–(h); a variety of rule-making hearings, 21 U.S.C. § 371(e)–(g); hearings to establish tolerances for pesticide chemicals in or on foods, 21 U.S.C. § 346a(d)–(i); hearings for the listing and certification of color additives, 21 U.S.C. § 376(b)–(d)].

The very sharp contrast between the statutory provision for informal *import* hearings and the provisions regarding the other types of hearings just referred to points up the Congressional intent to entrust "agency action" on imports to "agency discretion."[3]

■ This legislative intent is wholly in line with the complete power which Congress has over imports. Its constitutional authority "to regulate commerce with foreign nations" is "exclusive and plenary." See Board of Trustees of University of Illinois v. United States, 289 U.S. 48, 56, at page 57, 53 S.Ct. 509, 77 L.Ed. 1025 (1933), where the Court also declared:

> The Congress may determine what articles may be imported into this country and the terms upon which importation is permitted. No one can be said to have a vested right to carry on foreign commerce with the United States. * * * If the Congress saw fit to lay an embargo or to prohibit altogether the importation of specified articles, as the Congress may * * *, no state by virtue of any interest of its own would be entitled to override the restriction.

A leading case cited in this opinion is Buttfield v. Stranahan, 192 U.S. 470, 24 S.Ct. 349, 48 L.Ed. 525 (1903), which involved an administrative refusal to admit into the United States a shipment of tea found by a board of general ap-

---

2. Under 21 U.S.C. § 381(b), the Secretary has further discretionary power to authorize a conditional salvaging operation, if it "appears" to him that the product can be brought into compliance with the Act. Such authorization issued in this case. [Pet.Exh.L and Def.Exh. 1G]. The alternatives are re-export or destruction. [21 U.S.C. § 381(a)].

3. In an analogous situation under the Federal Food, Drug, and Cosmetic Act, it was held that an administrative determination under 21 U.S.C. § 334(a) (1), which could serve as a basis for multiple seizure actions, was not subject to judicial review. Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 600–601, 70 S.Ct. 870, 94 L.Ed. 1088 (1950).

praisers to be below certain standards set by the Secretary of the Treasury. The making of such a determination and the fixing of such standards were both provided for by the Tea Inspection Act. On page 493, 24 S.Ct. on page 354, the Court said:

> As a result of the complete power of Congress over foreign commerce, it necessarily follows that no individual has a vested right to trade with foreign nations which is so broad in character as to limit and restrict the power of Congress to determine what articles of merchandise may be imported into this country and the terms upon which a right to import may be exercised.

It was urged that there was a denial of due process because the importer was not accorded a hearing. This argument was emphatically rejected at page 497, 24 S.Ct. at page 356:

> The provisions in respect to the fixing of standards and the examination of samples by government experts was for the purpose of determining whether the conditions existed which conferred the right to import, and they therefore in no just sense concerned a taking of property. *This latter question was intended by Congress to be finally settled, not by a judicial proceeding, but by the action of the agents of the government, upon whom power on the subject was conferred.* [Emphasis added]

This underscored language applies precisely to the present case where Congress intended that the Secretary, or the employees to whom his authority is delegated, should make the final determination whether a food offered for import *appears* to be adulterated—without judicial review.

Later cases citing Buttfield v. Stranahan have restated and strengthened this ruling. In Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, at page 167, 71 S.Ct. 624, at page 646, 95 L. Ed. 817 (1951), (concurring opinion of Frankfurter, J.), the Court said:

The importation of goods is a privilege which, if Congress clearly so directs, may * * * be conditioned on *ex parte* findings.

In Cafeteria & Restaurant Workers Union etc. v. McElroy, 367 U.S. 886, at page 895, 81 S.Ct. 1743, at page 1749, 6 L.Ed.2d 1230 (1961), the Court observed:

> Where it has been possible to characterize that private interest * * * as a mere privilege subject to the Executive's plenary power, it has traditionally been held that notice and hearing are not constitutionally required.

By a coincidence, Buttfield v. Stranahan involved substandard tea whereas the present case involves unfit coffee. The principle in both cases is the same. Congress vested the administrative agency with the discretionary power to make the final determination as to the admissibility of the product, and the agency action is not reviewable in a judicial proceeding. For this reason, the Court lacks jurisdiction over the subject matter.

*Agency determinations under 21 U.S.C. § 381(a) are not subject to the requirements of 5 U.S.C. § 556(e), formerly 1006(d), Administrative Procedure Act*

 Petitioner insists that the agency determination must be based on the "exclusive record for decision" specified in 5 U.S.C. § 556(e), formerly 1006 (d). However, Section 556, by its own terms, applies only to "hearings required by section 553 or 554 (formerly 1003 or 1004) * * * to be conducted in accordance with this section." Section 553 (formerly 1003) deals with rule making and is clearly inapplicable here.

Section 554 (formerly 1004) deals with adjudications but does not apply here since it embraces only adjudications *required by statute to be determined on the record* after opportunity for an agency hearing." [Section 554 (a)]. The import provisions of the Federal Food, Drug, and Cosmetic Act

826

afford an opportunity for a limited hearing but do not require the agency action to be determined "on the record." On the contrary, the agency action refusing to admit the imported food is expressly authorized "if it appears from the examination of * * * samples or otherwise that * * * such article is adulterated * * *" [21 U.S.C. § 381(a)]. The Secretary may rely upon information available to him from any source, including that provided by the hearing. Consequently the condition prerequisite to the application of Section 554 is not met in this case.

Section 554(a) (3) exempts "proceedings in which decisions rest solely on inspections, tests, or elections." It appears in this case that the decision did rest solely on laboratory analyses and tests which showed that the damaged coffee beans and a brew made from them were nearly devoid of the flavor and color characteristics of normal coffee beans and of a brew made therefrom. However, to avoid limiting the broad language in 21 U.S.C. § 381(a), which authorizes resort to any source of information without restriction to inspections or tests, the Court does not decide whether the agency decision is exempt under Section 554(a) (3).

In 1962, Congress amended 21 U.S.C. § 381(a) but significantly made no reference to the Administrative Procedure Act as a guide for action under that Section. [76 Stat. 796]. Yet in the same amendatory legislation, Congress authorized the Secretary to designate official names for drugs, specifying that "Such designation shall be made * * * in accordance with the procedure set forth in section 1003 [now 553] of Title 5." [21 U.S.C. § 358(c); 76 Stat. 789]. This confirms the Court's conclusion that Congress did not intend the Administrative Procedure Act to govern agency actions *under Section 381(a)*.

*This is an unconsented suit against the United States*

■ As shown above, the Court lacks jurisdiction to review the agency action

under the Administrative Procedure Act. This is therefore an unconsented suit against the United States and beyond the jurisdiction of the Court.

■ The leading case on this point is Larson, War Assets Administrator v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L. Ed. 1628 (1949). On page 688, 69 S.Ct. 1457, the Court adverted to the fundamental rule that the courts do not have jurisdiction to adjudicate a suit against the Government unless the Government has consented to be sued. There, as here, the Government was not specifically named as a party. That, however, is not the test. On pages 687–688, 69 S.Ct. on page 1460, the Court said:

* * * it has long been established that the crucial question is whether the relief sought in a suit nominally addressed to the officer is relief against the sovereign. In a suit against the officer to recover damages for the agent's personal actions, that question is easily answered. The judgment sought will not require action by the sovereign or disturb the sovereign's property. There is, therefore, no jurisdictional difficulty. The question becomes difficult * * * when the suit is not one for damages but for specific relief: i. e., the recovery of specific property or * * * injunction either directing or restraining the defendant officer's actions. In each such case the question is directly posed as to whether, by obtaining relief against the officer, relief will not, in effect, be obtained against the sovereign. * * * If it is, *then the suit is barred,* not because it is a suit against an officer of the Government, but *because it is, in substance, a suit against the Government over which the court, in the absence of consent, has no jurisdiction.* [Emphasis added]

On page 704, 69 S.Ct. on page 1468, the Court declared:

* * * it is one thing to provide a method by which a citizen may be compensated for a wrong done to him

by the Government. It is a far different matter to permit a court to exercise its compulsive powers to restrain the Government from acting, or to compel it to act. *There are the strongest reasons of public policy for the rule that such relief cannot be had against the sovereign. The Government* as representative of the community as a whole, *cannot be stopped in its tracks* by any plaintiff who presents a disputed question of property or contract right. [Emphasis added] On pages 689–690, 69 S.Ct. 1457, the Court points out that there are *only* two situations in which restraint may be obtained against Government officials when the sovereign has not consented to be sued: (1) where the officer's action is outside the statutory limitation of his powers;[4] or (2) where the statute is unconstitutional. The present case does not fall within either of those exceptions. The officers' actions were strictly in accord with the statutory delineation of discretionary authority, and there is no assertion that the statute is unconstitutional. See also Dugan v. Rank, 372 U.S. 609, 620–621, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963).

This is clearly a suit where the Government is the real defendant, though not so designated. The Court lacks jurisdiction to entertain this suit in the absence of consent of the sovereign to be sued, and there is no such consent. In summary, with respect to the attempted judicial review of the instant administrative action, this Court concludes:

1. The sovereign is immune from suit unless it has consented to such suit.

2. Without attempting to decide precisely what the Administrative Procedure Act does do, it is clear from its own words that the Act does not authorize judicial review of agency actions where the agency action is "committed to agency discretion by law." Furthermore, the Act does not give consent to suits generally against the United States. See Blackmar v. Guerre, 342 U.S. 512, 515–516, 72 S.Ct. 410, 96 L.Ed. 534 (1952); Chournos v. United States, 335 F.2d 918, 919 (C.A. 10, 1964).

3. The agency action challenged in this proceeding is "committed to agency discretion by law" and is therefore not reviewable under the Administrative Procedure Act.

4. The Petition for a Writ of Mandatory Injunction does not name the United States as a respondent but is in reality a suit against the United States since it seeks to compel the sovereign to act in a specified manner through the agency of the named Respondents. Consent to this suit cannot be found in any statute.

5. Where the sovereign has not consented to a suit for judicial review of administrative action, such review may nevertheless be had in a suit against an officer, solely for the purpose of challenging the constitutionality of the statute, or of determining whether the officer's actions are outside the scope of his statutory authority.

6. Agency action in the present case is not limited to a "record of hearing" but is by statute authorized to be taken *"if it appears from the examination of such samples or otherwise that * * * such article is adulterated."* This demonstrates the fallacy of the Petitioner's argument since he asserts that the agency action must be based entirely and exclusively upon a "record of hearing." As shown above, it was not necessary for the Respondents to make the agency's examinations and investigations "a matter of record" at the hearing.

7. Since the agency action was well within the statutory authorization to act, and there is no challenge of its constitutionality, the Court lacks jurisdiction to review such action and Petitioner fails to state a claim upon which relief can be granted. An assertion of error in the exercise of the agency's power to

4. For the Court to have jurisdiction, the action must be *ultra vires* the officer's authority. "A claim of error in the exercise of that power is therefore not sufficient." 337 U.S. at page 690, 69 S.Ct. at page 1461.

act does not confer jurisdiction for judicial review. [See *Larson*, 337 U.S., at page 690, 69 S.Ct. 1457].

The Petition must therefore be dismissed because the Court lacks jurisdiction over the subject matter and because it fails to state a claim upon which relief can be granted.

*The agency action complained of is neither arbitrary nor capricious*

■ Petitioner cites two cases which held that agency action with respect to food imports is judicially reviewable to determine whether such action is arbitrary or capricious. Ambruster v. Mellon, 59 App.D.C. 430, 41 F.2d 430 (1930); The James J. Hill, 65 F.Supp. 265 (D.Md., April 4, 1946). In each case, the attack on the agency action failed.

The Court finds it significant that both of these cases were decided prior to the enactment of the Administrative Procedure Act on June 11, 1946, and prior to the Supreme Court decision in Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457 (1949). The Administrative Procedure Act and the *Larson* case have sharply delineated the types of agency action that are not subject to judicial review and call for a reconsideration of the validity of the review undertaken in *Ambruster* and *Hill.*

The Court is satisfied that a broad inquiry into whether this agency action is "arbitrary or capricious" is outside the jurisdiction of the Court. The only permissible inquiry is whether the statute is constitutional and whether the Respondents acted within the scope of their statutory authority in reaching a decision. As already shown, upon such a limited inquiry, this Petition must be dismissed. The Government is not to be "stopped in its tracks by any plaintiff who presents a disputed question of property * * * right." [See *Larson*, supra, 337 U.S., at page 704, 69 S.Ct., at page 1468].

If the Order of the Court directing a dismissal of the Petition should on appeal be found to be in error, this Court, nevertheless, on review of the agency action for reasonableness, concludes that it is clear from the pleadings, affidavits, and exhibits that such action was not arbitrary or capricious.

The above Statement of Facts recites in some detail the history of these coffee beans, the manner in which they were damaged by fire, smoke, and sea water, and the agency examinations which established that the beans are practically devoid of all of the characteristics of normal coffee beans. The beans are charred black as the result of prolonged exposure to fire, extreme heat, smoldering, sea water, and smoke. In appearance, odor, and flavor, these beans have lost their identity as coffee beans fit for human consumption.

Petitioner's first "Application for Authorization" requested agency permission to sell these coffee beans *"for use in blended or soluble coffee."* [Pet. Exh. K]. Conditional approval was granted which would *permit entry of the coffee beans "to be used only for the extraction of caffeine or for the production of soluble coffee,"* subject to examination of the finished product by the Food and Drug Administration before release. [Pet. Exh. L]. (It is doubtful that a satisfactory soluble coffee can be produced, but the agency was willing to have Petitioner make a pilot study if he wished to do so. [Def. Exh. 1G].

Petitioner's real objective appears to be an effort to parlay an "as is" $600 investment "for salvage" [Def. Exh. 5], plus additionally incurred expenditures for transportation, reconditioning and storage, into a gross return of some $40,-000 [Def. Exh. 1D] at the expense of the ultimate consumer, by mixing these damaged beans with normal beans in the production of blended coffee. [Petition, p. 4]. This the agency refused to authorize "since this would amount to nothing more than diluting a legal article of food with an article which is unfit for food to make a low grade finished product." [Def. Exh. 1G].

At the administrative hearing, Petitioner offered the testimony of a witness whose work relates to the blending of various coffee beans which would result in an "acceptable" drink. Regarding the problem of preparing a blend with the charred beans in question, the witness said [Pet. Exh. I–1, p. 29]:

> In this case, *this particular coffee with its changed profile, represented a, one might say, challenge.* [Emphasis added]

This is a remarkable circumlocution and understatement, since the real issue was how to disguise these damaged beans through a blend and grind with normal coffee beans so that the public might think the finished product is coffee. The witness met the "challenge" by proposing a blend of 10 per cent "reconditioned coffee" and 90 per cent Brazilian coffee. [Pet. Exh. I–1, pp. 30–37].

A major function of the Food and Drug Administration is to preserve the integrity of the food supply and

> to protect the consumer from "economic adulteration", by which less expensive ingredients [are] substituted, or the proportion of more expensive ingredients diminished, so as to make the product, although not in itself deleterious, inferior to that which the consumer expect[s] to receive when purchasing a product with the name under which it [is] sold. [Federal Security Administrator v. Quaker Oats Co., 318 U.S. 218, 230, 63 S.Ct. 589, 596, 87 L.Ed. 724 (1943)].

Petitioner's proposal to blend the charred coffee beans with normal coffee beans is in reality a proposal to adulterate the good coffee beans, by substituting in part a cheapened and worthless commodity for genuine coffee beans. It is as though the proposal were to make a blend of *used coffee grounds* with freshly ground coffee. No doubt a skillful "blending" of the charred coffee beans with genuine coffee beans, or of used coffee grounds with freshly ground coffee, would enable a coffee producer to palm off the finished product on an unsuspecting public as coffee.

The *spent component* adds nothing of value to the finished product *except bulk*. Bulk of this type could be of value only to producers or distributors insofar as it might enable them to perpetrate a deception upon the ultimate purchaser by using a worthless item as a food extender.

Under these circumstances, the agency action in question cannot be said to be "arbitrary or capricious." If Petitioner's request to make a coffee blend had been granted, the Food and Drug Administration would have been grossly derelict in the performance of its duties.

*Respondents are entitled to a summary judgment*

If the Order dismissing the Petition should be reversed, then Respondents are clearly entitled to a summary judgment under Civil Rule 56.

The only issue at this stage would be whether *"it appears from examination of \* \* \* samples or otherwise that \* \* \* such article is adulterated."* [21 U.S.C. § 381(a)]. If the Respondents had any reasonable basis for concluding "from examination of the samples or otherwise" that it "appears" that the charred coffee beans are adulterated, the statute required them to refuse admission or to authorize it only upon conditions which would bring the article into compliance with law.

The affidavits, exhibits, and physical specimens before this Court show sound reason for holding that the charred beans *"appear"* to be adulterated. There is therefore no genuine issue of material fact even if Petitioner should argue that the beans are not in fact adulterated. The issue is not whether they are *in fact* adulterated but whether they *appear* to be adulterated. Consequently, even if it were assumed that this Court has jurisdiction, this case is now ready for summary judgment in favor of the Respondents. For an analogous situation, see United States v. 354 Bulk Cartons Trim Reducing-Aid Cigarettes, 178 F.Supp. 847, 852–853 (D.N.J., 1959), where a summary judgment was granted in favor

of the Government on the ground that the drug was not "generally recognized" by qualified experts as safe, *the lack of general recognition as to safety being established by conflicting medical affidavits*. See also Rankin v. King, 272 F.2d 254, 258 (C.A. 9, 1959), and Henderson v. A. C. Spark Plug Division, etc., 366 F.2d 389, 393 (C.A. 9, 1966).

### Conclusion

For the reasons stated above:

1. Petitioner's Motion for Summary Judgment is denied, and

2. Respondents' Motion to Dismiss the Petition is granted.

For the reasons stated above, in the event the granting of Respondents' Motion to Dismiss the Petition is found to be in error, Respondents' alternative Motion for Summary Judgment is granted.

Respondents shall submit an appropriate order consonant with the foregoing.