PANAMA CANAL CO. *v.* GRACE LINE, INC., ET AL.

No. 251.   Argued April 2–3, 1958.—Decided April 28, 1958.*

*Together with No. 252, *Grace Line, Inc., et al.* v. *Panama Canal Co.,* also on certiorari to the same Court.

*Solicitor General Rankin* argued the cause for the Panama Canal Co. With him on the brief were *Assistant Attorney General Doub, Paul A. Sweeney* and *Herman Marcuse.*

*C. Dickerman Williams* argued the cause for petitioners in No. 252 and respondents in No. 251. With him on the brief were *Gregory A. Harrison* and *J. Stewart Harrison.*

Briefs of *amici curiae* were filed by *Lawrence Hunt* for the Government of the United Kingdom of Great Britain and Northern Ireland, and *James M. Estabrook* for Aktieselskabet Dampskibsselskabet Svendborg et al.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Respondents, American shipping companies using the Panama Canal, brought this suit in the District Court to compel petitioner, the Panama Canal Co., to prescribe new tolls for the use of the Canal and to refund tolls which it was alleged had been illegally collected in the past. The District Court dismissed the complaint for lack of jurisdiction of the subject matter. 143 F. Supp. 539. The Court of Appeals refused relief for a refund but on other phases of the complaint entered a summary judgment for the respondent. 243 F. 2d 844. The cases are here on petitions for certiorari which we granted because of the importance of the questions presented. 355 U. S. 810.[1]

---

[1] In No. 251 we granted the Panama Canal Co.'s petition for certiorari and in No. 252 we granted a cross-petition filed by the respondents in No. 251. The Panama Canal Co. will hereinafter be referred to as the petitioner. It is not necessary to discuss the petitions separately under the view we take of these cases.

Petitioner was created by Congress in 1950. 64 Stat. 1041. It holds the assets of the Panama Canal and has the duty of operating and maintaining it. It may sue and be sued in its corporate name. Canal Zone Code, Tit. 2, § 248, 62 Stat. 1078, as amended, 64 Stat. 1038. Prior to 1950 the Panama Canal was operated by the President through the Governor of the Canal Zone. 37 Stat. 561. Business activities incident to that operation were conducted by the Panama Railroad Co., a federal corporation, 62 Stat. 1076, which was an agency and instrumentality of the United States, *ibid.* Those auxiliary business activities were "designed and used to aid" in the management and operation of the Canal. See *New York ex rel. Rogers* v. *Graves,* 299 U. S. 401, 406. Since 1950 all those business activities have been carried on by petitioner, the Panama Canal Co., all of whose stock is held by the President or his designee, Canal Zone Code, Tit. 2, § 246 (a), the present designee being the Secretary of the Army.

The Hay-Pauncefote Treaty, proclaimed February 22, 1902, 32 Stat. 1903, provided in Article III that the "charges of traffic shall be just and equitable." Under the original Panama Canal legislation, 37 Stat. 562, the President was authorized to fix the tolls on six months' notice by proclamation. Under that Act the tolls were to be not less than 75¢ nor more than $1.25 per net registered ton. In 1937 the ceiling was lowered to $1 per net vessel ton, the minimum of 75¢ being retained. 50 Stat. 750. When President Truman in 1948 sought to increase the toll rate to the statutory maximum, 62 Stat. 1494, Congress asked the President to withhold action until the entire problem could be studied. See H. R. Rep. No. 1304, 81st Cong., 1st Sess. 7. President Truman agreed by revoking his proclamation, 64 Stat. A433, and agreeing to the study.

On the basis of that study Congress separated the governmental functions of the Canal from its transit and business functions, the latter to be operated by petitioner. See H. R. Doc. No. 460, 81st Cong., 2d Sess.; H. R. Rep. No. 2935, 81st Cong., 2d Sess. It was learned that if the Canal were operated at cost, the tolls would have to be raised to a prohibitive level. Congress therefore undertook to reduce the financial burden that was imposed upon the users of the Canal. The interest on the capital investment of the United States was reduced and interest accrued during the construction period was to be disregarded for the purposes of computing interest on the capital investment. Free transits of government-owned vessels were eliminated for accounting purposes. The supporting business activities previously operated by the Panama Railroad Co. were to bear a proportionate share of the cost of the Canal Zone Government from which they had been exempted. H. R. Doc. No. 460, 81st Cong., 2d Sess. And the "net costs of operation of the Canal Zone Government" were declared by Congress "to form an integral part of the costs of operation of the Panama Canal enterprise as a whole." See Canal Zone Code, Tit. 2, § 246 (e), 64 Stat. 1041.

It was to carry out these provisions that the Congress merged the functions of operating and maintaining the Canal with the business activities formerly carried on by the Panama Railroad Co. At the same time, the Congress, by the Act of September 26, 1950, 64 Stat. 1038, Canal Zone Code, Tit. 2, §§ 411, 412, made changes in the provisions for the fixing of tolls.

Section 411 provides:

"The Panama Canal Company is authorized to prescribe and from time to time change (1) the rules for the measurement of vessels for the Panama Canal, and (2), subject to the provisions of the section next following, the tolls that shall be levied for the use of

the Panama Canal: *Provided, however,* That the rules of measurement, and the rates of tolls, prevailing on the effective date of this amended section shall continue in effect until changed as provided in this section: *Provided further,* That the said corporation shall give six months' notice, by publication in the Federal Register, of any and all proposed changes in basic rules of measurement and of any and all proposed changes in rates of tolls, during which period a public hearing shall be conducted: *And provided further,* That changes in basic rules of measurement and changes in rates of tolls shall be subject to, and shall take effect upon, the approval of the President of the United States, whose action in such matter shall be final and conclusive."

Section 412 (b) provides the formula which petitioner must employ in computing new tolls:

"Tolls shall be prescribed at a rate or rates calculated to cover, as nearly as practicable, all costs of maintaining and operating the Panama Canal, together with the facilities and appurtenances related thereto, including interest and depreciation, and an appropriate share of the net costs of operation of the agency known as the Canal Zone Government. In the determination of such appropriate share, substantial weight shall be given to the ratio of the estimated gross revenues from tolls to the estimated total gross revenues of the said corporation exclusive of the cost of commodities resold, and exclusive of revenues arising from transactions within the said corporation or from transactions with the Canal Zone Government."

By § 412 (c) vessels operated by the United States, including naval ships, may "in the discretion of the President" be required to pay tolls. In the event they do not, tolls shall nevertheless be computed for that use and the

amounts thereof "shall be treated as revenues of the Panama Canal Company for the purpose of prescribing the rates of tolls."

A Committee of the Congress in 1953 directed petitioner to determine the adequacy of the canal tolls. See H. R. Rep. No. 889, 83d Cong., 1st Sess. 10. Petitioner in reply stated that no increase in tolls was at that time indicated but that, should canal traffic decline, and should the decline appear likely to continue for an appreciable length of time, "the Company will promptly take the steps available to it to increase the rates of tolls." [2]

---

[2] The reply was in the form of a letter to the Speaker of the House from J. S. Seybold, President of petitioner, 100 Cong. Rec. (daily ed.) A1995, stating, *inter alia:*

"An initial study of the adequacy of tolls rates under the new legislation has now been completed by the Company. This study reveals that, largely as a result of the very high level of traffic using the canal in recent years without a corresponding increase in costs, the tolls rates that have been in effect since 1938 are still sufficient to cover all operating costs, including interest and depreciation, as required by the tolls statutes. This conclusion is based on the assumption that the Director of the Bureau of the Budget, who under the law must approve the valuation of the assets transferred to the Company from the agency formerly known as the Panama Canal, will concur generally in the valuations tentatively established by the Company upon which the interest and depreciation requirements for the most part have been based.

"In recent months, chiefly as the result of the cessation of hostilities in Korea, there has been some drop in traffic transiting the canal. The Company's study indicates that a further and more substantial decline in the volume of canal traffic during the next few years is to be expected primarily as the result of changing economic factors affecting world movements of petroleum and its products, iron ore, and coal. It is possible that by sometime during the fiscal year 1955 canal traffic will have declined to a point where revenues at existing rates will no longer be adequate to cover all charges. Should this condition materialize and should it appear reasonably certain that it will continue for an appreciable length of time, the Company will promptly take the steps available to it to increase the rates of tolls.

"In computing the tolls requirements for purposes of this study the

Petitioner, being a wholly owned government corpora-tion, is subject to annual audit by the General Account-ing Office.  59 Stat. 599, 31 U. S. C. § 850.  And it is

Company has made what it believes to be an adequate allowance for depreciation giving due consideration to the factors of obsolescence and potential inadequacy of the capital assets includable in the tolls base.  Estimates of the service lives used for the principal classes of plant and equipment have been approved by independent engineering consultants.  A depreciation rate of 1 percent per annum from date of service has been used for the investment in the channel, harbors, lock structures, dams, breakwaters and similar long-lived facilities.  Including this accrual the annual depreciation requirements of the Company are presently approximately $9 million.

"The tentative valuations used in the study result in a net interest-bearing investment of the Government in the Canal enterprise, as defined by law, of $274 million.  At the rate of 2.342 percent currently established for repayment of interest costs as required by the Company's charter annual interest payments to the Treasury will amount to $6.4 million.  It is expected that this amount will increase somewhat in the future years as the result of the generally rising trend of long term interest rates.

"No depreciation or return on the capital value of interest during the 1904-14 construction period has been included in the study because the legislative history of the present tolls statutes clearly indicates the intent of the Congress to exclude this item entirely from the tolls base.  Likewise no provision has been made for amortization of lands and treaty rights because of lack of statutory authority, although these assets have been included in the investment for interest purposes.

"Using the tentative plant valuations developed by the Company and recomputing the operating costs and expenses accordingly, the aggregate net income of the Company from all sources for the 4-year period from the reorganization to June 30, 1955, under present tolls rates is estimated to be approximately $9 million after providing for all charges currently authorized and required by law.  As previously indicated however, it appears that a possible decline in volume of Canal traffic coupled with rising interest and wage rates may necessitate an increase in the tolls rates in the near future.  Current indications are that such an increase may be necessary by July 1, 1955, in which case public announcement of the new rates would be made 6 months earlier or January 1, 1955, as required by law."

provided that the Comptroller General shall report on this audit to the Congress with "such comments and information as may be deemed necessary to keep Congress informed of the operations and financial condition" of the corporation, "together with such recommendations" as the Comptroller General may deem advisable. 31 U. S. C. § 851.

The Comptroller General in 1955 expressed the view that the petitioner had allocated too high a share of the costs of the Canal Zone Government, of the corporate overhead, and of interest payments to the operations of the Canal and too little to its supporting or auxiliary activities. H. R. Doc. No. 160, 84th Cong., 1st Sess. According to his method of cost allocation, the canal operations showed a large surplus, the auxiliary or supporting activities a deficit. *Ibid.* He also claimed that the prices charged for the latter activities were inadequate. *Ibid.* He went on to give his construction of § 412 (b) of the Canal Zone Code, which was that the tolls must be computed exclusively on the basis of the cost of operating the Canal without reference to the losses incident to the auxiliary or supporting operations. *Ibid.* He thought this result to be unsound and recommended that § 412 (b) be amended to provide specifically that any losses of the auxiliary or supporting activities be included in the cost basis for the determination of the canal tolls. *Ibid.*

Petitioner vigorously opposes that construction of § 412 (b), maintaining that the Comptroller's methods of cost allocation and his conclusions violate both sound accounting practices and the Act. Petitioner in particular objects to the Comptroller General's view that the Act requires the computation of toll rates without regard to any deficit in the operation of the auxiliary or supporting business activities. Petitioner concludes that the downward revision of the tolls recommended by the Comp-

troller General is not in harmony with the congressional program and that no change in the toll formula is needed.

It was shortly after the Comptroller General's Report for 1954 was submitted to the Congress that respondents instituted this suit.

It is, we think, impermissible to conclude that, because petitioner may sue and be sued, this suit can be maintained. We deal here with a problem in the penumbra of the law where generally the Executive and the Legislative are supreme. We do not say, for we are not called upon to do so, that no justiciable issues can arise out of the toll-making procedure for the Panama Canal. All we hold is that the controversy at present is not one appropriate for judicial action.

Section 10 of the Administrative Procedure Act, 60 Stat. 243, 5 U. S. C. § 1009, excludes from the categories of cases subject to judicial review "agency action" that is "by law committed to agency discretion." We think the initiation of a proceeding for readjustment of the tolls of the Panama Canal is a matter that Congress has left to the discretion of the Panama Canal Co. Petitioner is, as we have seen, an agent or spokesman of the President in these matters. It is "authorized" to prescribe tolls and to change them. Canal Zone Code, Tit. 2, § 411. But the exercise of that authority is far more than the performance of a ministerial act. As we have seen, the present conflict rages over questions that at heart involve problems of statutory construction and cost accounting: whether an operating deficit in the auxiliary or supporting activities is a legitimate cost in maintaining and operating the Canal for purpose of the toll formula. These are matters on which experts may disagree; they involve nice issues of judgment and choice, *New York* v. *United States,* 331 U. S. 284, 335, which require the exercise of informed discretion. Cf. *United States ex rel. McLennan* v. *Wilbur,* 283 U. S. 414; *Interstate Commerce*

*Commission* v. *Humboldt S. S. Co.,* 224 U. S. 474, 484–485. The case is, therefore, quite unlike the situation where a statute creates a duty to act and an equity court is asked to compel the agency to take the prescribed action. Cf. *Virginian R. Co.* v. *System Federation,* 300 U. S. 515, 551; *Kansas City So. R. Co.* v. *Interstate Commerce Commission,* 252 U. S. 178. We put the matter that way since the relief sought in this action is to compel petitioner to fix new tolls. The principle at stake is no different than if mandamus were sought—a remedy long restricted, *Marbury* v. *Madison,* 1 Cranch 137, 166; *Decatur* v. *Paulding,* 14 Pet. 497, 514–517, in the main, to situations where ministerial duties of a nondiscretionary nature are involved. Where the matter is peradventure clear, where the agency is clearly derelict in failing to act, where the inaction or action turns on a mistake of law, then judicial relief is often available. *Harmon* v. *Brucker,* 355 U. S. 579, is a recent example. There the Secretary of the Army issued less than "honorable" discharges to soldiers, based on their activities prior to induction. The Court held that the "records," prescribed by Congress as the basis for his action, were only records of military service. But where the duty to act turns on matters of doubtful or highly debatable inference from large or loose statutory terms, the very construction of the statute is a distinct and profound exercise of discretion. See *Work* v. *Rives,* 267 U. S. 175, 183; *Wilbur* v. *Kadrie,* 281 U. S. 206, 219; *United States ex rel. Chicago Great Western R. Co.* v. *Interstate Commerce Commission,* 294 U. S. 50, 62–63. We then must infer that the decision to act or not to act is left to the expertise of the agency burdened with the responsibility for decision.

We think this case is in that area. The petitioner, as agent of the President, is given questions of judgment requiring close analysis and nice choices. Peti-

tioner is not only agent for the President but a creature of Congress. It is on close terms with its committees, reporting to the Congress, airing its problems before them, looking to Congress for guidance and direction. It is at least arguable that Congress to date has sided with petitioner and against the Comptroller General in construing §§ 411 and 412 of the Code. For Congress, fully advised of the Comptroller General's views in his Report for 1954, approved the budgets for the Panama Canal Co. for 1956, 1957, and 1958, based on petitioner's interpretation of the statute and its methods of accounting and cost allocation, 69 Stat. 235–237, 70 Stat. 322–324, 71 Stat. 78.[3] That does not necessarily mean that the construction of the Act, pressed on us and on Congress by petitioner, is the correct one. It does, however, indicate that the question is so wide open and at large as to be left at this stage to agency discretion.[4] The matter should be far less cloudy, much more clear for courts to intrude.

*Reversed.*

---

[3] Congress has been repeatedly informed of the basic problem involved here, indeed of this very litigation. See, *e. g.*, Reports on Audit of Panama Canal Company and the Canal Zone Government, by the Comptroller General: For the Fiscal Year Ending June 30, 1954, H. R. Doc. No. 160, 84th Cong., 1st Sess. 1–3, 8–9, 12–18; For the Fiscal Year Ending June 30, 1955, H. R. Doc. No. 465, 84th Cong., 2d Sess. 2, 9–10, 17–24; For the Fiscal Year Ending June 30, 1956, H. R. Doc. No. 210, 85th Cong., 1st Sess. 2–5, 15–21. See also, Hearings before the Subcommittee on Panama Canal of the House Committee on Merchant Marine and Fisheries on H. R. 6917, 7645, and 7697, 84th Cong., 1st Sess. 159–165; Hearings before the Subcommittee of the Senate Committee on Interstate and Foreign Commerce on S. 2167, 84th Cong., 2d Sess. 23, 68–70, 89–92, 101–102.

[4] A bill was introduced in the Senate in 1955, S. 2167, 84th Cong., 1st Sess., by Senator Magnuson which would give judicial review of agency action in fixing tolls. That bill was reported favorably by the Committee, S. Rep. No. 2375, 84th Cong., 2d Sess. But it never came to a vote. See 102 Cong. Rec. 11541, 12791, 13901.