**CARL BORCHSENIUS CO., Inc.,**
**Plaintiff,**

**v.**

**John W. GARDNER, U. S. Secretary of Health, Education and Welfare, and C. C. Freeman, Acting Director, Food and Drug Administration, New Orleans, La., Defendants.**

**Civ. A. No. 68–321.**

United States District Court
E. D. Louisiana,
New Orleans Division.

March 15, 1968.

Henry J. Read, John B. Gooch, Jr., New Orleans, La., for plaintiff.

Joan Elaine Chauvin, Asst. U. S. Atty., New Orleans, La., for defendants.

CASSIBRY, District Judge:

This is a proceeding in the nature of mandamus in which the plaintiff, Carl Borchsenius Co., Inc., a New York corporation, consignee of a shipment of coffee intended for import, is seeking to compel the defendants, John W. Gardner, Secretary of Health, Education and Welfare, and C. C. Freeman, Acting District Director, Food and Drug Administration, New Orleans, Louisiana, to release for export a portion of the shipment found to be so damaged that it could not be brought into compliance with the Food, Drug, and Cosmetic Act. The defendants are withholding the release for import of the sound coffee on the condition that the unsound coffee be destroyed.

The shipment of 5,000 bags of coffee, weighing 665,000 pounds with an estimated invoice value of $227,000, arrived at the Port of New Orleans from Paranagua, Brazil aboard the Mario D'Almeida on November 21, 1967. Admission for import of this shipment was sought by the filing of a "Consumption Entry" on November 24, 1967 with the Bureau of Customs in New Orleans offering the coffee for import as twenty-five hundred bags marked ALFER CBC 301/LX1 and twenty-five hundred bags marked ALFER CBC 301/LV1. The unloading of the vessel had commenced on November 21, but the 5,000 bags of coffee here involved were not unloaded until November 30 and December 1. Before their removal from the ship certain of the bags were damaged by contact with water, although it is not known exactly how the coffee got wet.

A wharf examination of the shipment by a United States Food and Drug Inspector on December 1 disclosed damp, moldy coffee in four of the six samples taken in the inspection. Approximately 1,500 bags were wet and some contained moldy coffee. The entire shipment of

5,000 bags was detained by the Food and Drug Administration in accordance with the import provisions of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 381, and notice was given of opportunity, among other things, to present evidence as to the manner in which the coffee could be brought into compliance with the Act.

On December 1, plaintiff filed an application for authorization pursuant to 21 U.S.C. § 381(b) to attempt to bring the 5,000 bags of coffee into compliance with the Act by the procedure of "skimming the coffee to remove molded beans" and "drying the coffee out to remove wet beans." This authorization was given on December 4. Reconditioning of the coffee had actually begun, however, before the approval was given because of the fact that, if not dried immediately, more coffee would mold. The coffee had been moved to and the reconditioning was done at the warehouse of Dupuy Storage and Forwarding Corporation on Decatur Street in New Orleans.

Of the 5,000 bags, examination showed 2,325 to be sound, and upon request of plaintiff's representative these bags were released under a partial release of the shipment on December 8. The reconditioning of the remainder of the shipment was finished by December 20, and the Import Inspector's examination showed on December 21 that, of the 2,789 bags received for reconditioning, 1,730 bags were made sound and thus brought into compliance with the law, 270 bags were poor skims, 231 bags were sweepings, and 1,053 bags were too poor to skim due to mold.

On December 26, the defendant C. C. Freeman, Acting Director of the Food and Drug Administration for this District, advised the plaintiff's representative by letter that a "Release Notice" on the 1,730 bags made sound would be issued upon receipt of proof of destruction of the remaining 270 bags of poor skims, 231 bags of sweepings and 1,053 bags of moldy coffee in original bags. The plaintiff had no objection to destruction of the 270 bags of poor skims and the 231

bags of sweepings, but its representative requested on January 2, 1968 that the 1730 bags of "made sound" coffee be released for import and that it be allowed to burnish, rebag and export the 1,053 bags which had not been reconditioned. The request to burnish, rebag and export was denied by Acting Director Freeman by letter of January 3 in which he advised:

"* * * Had your original intention been to export the entire lot, we would have issued a Refusal of Admission which would have permitted this. However you elected to bring these lots into compliance * * *. Now, under no circumstances can we allow that portion of the shipment in which the damage was concentrated to be exported. These bags are rejects from a reconditioning operation and must be destroyed under customs' supervision. "* * *

"As we advised you in our letter of December 26, 1967, we will issue release on the 1,730 bags of 'made sound' coffee upon receipt of proof of destruction of the 1,053 bags of moldy coffee, the 270 bags of poor skims and the 231 bags of sweepings."

On February 6, plaintiff's representative requested permission to export the 1,053 bags of unreconditioned coffee in the original bags, without burnishing and rebagging, which was refused, and this action followed on February 15.

Proceeding by summary process on an allegation of necessity to avoid deterioration of the coffee, the plaintiff contended that the coffee was being illegally detained by the defendants (1) because the 1,730 bags of sound coffee met the standards for importation; (2) because the 1,053 bags which have not been reconditioned have substantial commercial value for exportation to the country of origin and/or to European markets and the law permits the export of these bags upon compliance with the provisions of 21 U.S.Code § 334(d) and 21 U.S.Code § 381(a), (b) and (d); (3) and because the demand for destruction of the 1,053

unreconditioned bags of coffee as a condition precedent for the release of the 1,730 bags of admittedly sound coffee is arbitrary, capricious, and contrary to the applicable statutes. The plaintiff prayed that this Court order the defendants:

(1) to release from custody for importation into the United States 1730 bags of reconditioned sound coffee, consisting of 760 bags marked ALFER CBC 301/LV-1 and 970 bags marked ALFER CBC 301/LX-1, which are presently being detained by the defendants in the warehouse of Dupuy Storage and Forwarding Corporation; and

(2) to release from custody for export 1053 bags (out of the original shipment of 5000 bags marked ALFER CBC 301/LV-1 and ALFER CBC 301/LX-1), which 1053 bags have not been reconditioned and remain in the original bags in which they were shipped, and which are detained by defendants in the warehouse of Dupuy Storage and Forwarding Corporation, upon compliance with the requirements of the applicable statutes.

The defendants were ordered to show cause on February 28 why the relief prayed for should not be granted.

On February 23, the defendants filed a motion to dismiss based on the grounds that (1) the Court lacks jurisdiction over the subject matter, and (2) the complaint seeking relief in the nature of mandamus fails to state a claim upon which relief can be granted; and filed a motion for summary judgment on the ground that there is no genuine issue as to any material fact and thus defendants are entitled to judgment as a matter of law. These motions were set for hearing on February 28 also.

At the hearing all parties were given the opportunity to present all evidence relevant to any issue in the case. There is essentially no dispute as to the facts of the case concerning the water damage to the coffee and the disposition of the shipment under the supervision of the Food and Drug Administration. A coffee surveyor, John P. McKee, familiar with this coffee shipment, testified for the plaintiff that in his opinion the 1,053 bags of unreconditioned coffee has a commercial net value for export of $20 to $25 per bag. According to him Belgium and Holland has a market for coffee in this condition, and after Hurricane Betsy in 1965 a quantity of coffee in worse condition than this was exported with his arrangements. The defendants' witness Paul J. Dugas, a Food and Drug Administration Import Inspector, testified as to the mold and decomposition of the coffee beans in samples taken and these were introduced into evidence, but he admitted that he had no intention to testify about their potential value for export.

Mr. Dugas explained that skimming was a process whereby the bag of coffee is laid flat on an even surface, the top of the bag is cut off and the moldy coffee skimmed off in a way to insure that no moldy coffee remains. "Sweepings" are the coffee spilled in the ship and on the wharf when bags break in the unloading of vessels. These "sweepings" are routinely exported according to him.

There is no serious dispute between the parties as to the law applicable to judicial authority in this case to review the administrative agency action. The plaintiff contends that the Court has jurisdiction to consider the case under 28 U.S.C. § 1361,[1] and authority to grant the relief sought under the provisions of the Administrative Procedure Act, 5 U.S.C. § 702,[2] because the Food and Drug Administration of the Department of Health, Education and Welfare has ex-

---

1. "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

2. "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

ceeded the statutory authority granted the administrative agency under 21 U.S.C. § 381(b).

All of the defendants arguments as to lack of jurisdiction and lack of authority to render relief in the nature of mandamus are based on the contention that the agency was acting within the scope of discretionary authority under the statute in the handling of this coffee shipment offered for import.

■■ The Court agrees that generally speaking judicial relief is not appropriate to relieve a party from administrative action if the administrative agency has exercised discretionary authority granted to it under a statute. Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958); Sugarman v Forbragd, 267 F.Supp. 817 (N.D.Cal., 1967); see also Magnolia Petroleum Co. v. Federal Power Commission, 236 F.2d 785 (C.A.5, 1956); Chernock v. Gardner, 360 F.2d 257 (C.A.3, 1966); Ferry v. Udall, 336 F.2d 706 (C.A.9, 1964), cert. den. 381 U.S. 904, 85 S.Ct. 1449, 14 L.Ed.2d 286. On the other hand it is well settled that judicial relief is appropriate to relieve aggrieved persons from administrative action beyond the statutory grants of authority. In Stark v. Wickard, 321 U.S. 288, 64 S.Ct. 559, 571, 88 L.Ed. 733, the Supreme Court said:

" * * * When Congress passes an Act empowering administrative agencies to carry on governmental activities, the power of those agencies is circumscribed by the authority granted. This permits the courts to participate in law enforcement entrusted to administrative bodies only to the extent necessary to protect justiciable individual rights against administrative action fairly beyond the granted powers. The responsibility of determining the limits of statutory grants of authority in such instances is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction. * * * "

To the same effect Waite v. Macy, 246 U.S. 606, 38 S.Ct. 395, 62 L.Ed. 892 (1918); Hammond v. Hull, 76 U.S.App. D.C. 301, 131 F.2d 23 (1942); Bowman v. Retzlaff, 65 F.Supp. 265 (D.C.Md., 1946).

The only issue before the Court is whether the defendants acted within the limits of their statutory authority in this case, and to resolve that issue the Court must determine whether the defendants have the discretion under 21 U.S.C. § 381(b) to require destruction of articles offered for import, which are rejected because they cannot be brought into compliance with the Act, without giving the applicant an opportunity to export the rejected articles.

The plaintiff contends that the defendants have no such discretion, arguing that the coffee under detention in this case has not cleared customs, has not entered the channels of interstate commerce, and its disposition is governed by the import-export provision of 21 U.S.C. § 381, and that, under the facts of this case, 21 U.S.C. § 381(a) and (b) accord the plaintiff the right to export within 90 days the coffee which is refused admission. The defendants contend that 21 U.S.C. § 381(b) plainly gives them discretion in supervising the reconditioning of adulterated foods to effect compliance and empowers them to the extent that compliance may not be effected thereunder to require at their discretion destruction or export of rejected articles.

Sub-Sections (a) and (b) of 21 U.S.C. § 381, which are involved here, read:

"(a) The Secretary of the Treasury shall deliver to the Secretary of Health, Education, and Welfare, upon his request, samples of food, drugs, devices, and cosmetics which are being imported or offered for import into the United States, giving notice thereof to the owner or consignee, who may appear before the Secretary of Health, Education, and Welfare and have the right to introduce testimony. The Secretary of Health, Education, and Welfare shall furnish to the Secretary

of the Treasury a list of establishments registered pursuant to section 360(i) of this title and shall request that if any drugs manufactured, prepared, propagated, compounded, or processed in an establishment not so registered are imported or offered for import into the United States, samples of such drugs be delivered to the Secretary of Health, Education, and Welfare, with notice of such delivery to the owner or consignee, who may appear before the Secretary of Health, Education, and Welfare and have the right to introduce testimony. If it appears from the examination of such samples or otherwise that (1) such article has been manufactured, processed, or packed under insanitary conditions, or (2) such article is forbidden or restricted in sale in the country in which it was produced or from which it was exported, or (3) such article is adulterated, misbranded, or in violation of section 355 of this title, then such article shall be refused admission, except as provided in subsection (b) of this section. The Secretary of the Treasury shall cause the destruction of any such article refused admission unless such article is exported, under regulations prescribed by the Secretary of the Treasury within ninety days of the date of notice of such refusal or within such additional time as may be permitted pursuant to such regulations. This subsection shall not be construed to prohibit the admission of narcotic drugs the importation of which is permitted under section 173 of this title."

"(b) Pending decision as to the admission of an article being imported or offered for import, the Secretary of the Treasury *may authorize delivery* of such article to the owner or consignee upon the execution by him of a good and sufficient bond providing for the payment of such liquidated damages in the event of default as may be required pursuant to regulations of the Secretary of the Treasury. If it appears to the Secretary of Health, Edu-

cation, and Welfare that an article included within the provisions of clause (3) of subsection (a) of this section can, by relabeling or other action, be brought into compliance with this chapter or rendered other than a food, drug, device, or cosmetic, final determination *as to admission of such article* may be deferred and, upon filing of timely written application by the owner or consignee and the execution by him of a bond as provided in the preceding provisions of this subsection, the Secretary of Health, Education, and Welfare may, in accordance with regulations, authorize the applicant to perform such relabeling or other action specified in such authorization (including destruction or export of rejected articles or portions thereof, as may be specified in the Secretary's authorization). All such relabeling or other action pursuant to such authorization shall in accordance with regulations be under the supervision of an officer or employee of the Department of Health, Education, and Welfare designated by the Secretary of Health, Education, and Welfare, or an officer or employee of the Department of the Treasury designated by the Secretary of the Treasury."

The defendants agree that the owner or consignee could choose to export articles refused admission under the language in subsection (a) that "The Secretary of the Treasury shall *cause the destruction of any such article refused admission unless such article is exported,* * * *"*, and they agree that had the plaintiff in this case not chosen to attempt to bring the coffee into compliance under subsection (b), it would have had the choice of exporting the entire shipment of 5000 bags. (Italics here and elsewhere mine). They argue that such a choice is not available to an owner or consignee as to rejected articles from the attempt at compliance under the language of subsection (b) that "the Secretary of Health, Education and Welfare may, in accordance with regulations authorize the applicant to perform such relabeling or

other action specified in such authorization (*including destruction or export of rejected articles or portions thereof,* as may be specified in the Secretary's authorization)," and that the rejected articles may be ordered destroyed at their discretion.

This contention of defendants as to their discretion under 381(b) is not only at variance with the policy set by Congress as to the disposition of articles rejected for admission set out in 381(a), but is at variance with a continuing policy of Congress as to the disposition of articles refused admission for import commencing with Act of March 2, 1883, c. 64, 22 Stat. 451, entitled "An act to prevent the importation of adulterated and spurious Teas." That act provided that if, after final re-examination for purity and fitness and consumption,

> "the tea shall be found to come within the prohibitions of this act, the importer or consignee shall give a bond, with securities satisfactory to the collector to export said tea * * * out of the limits of the United States, within a period of six months after such final re-examination: but if the same shall not have been exported within the time specified, the collector, at the expiration of that time, shall cause the same to be destroyed."

This same policy of giving the importer a choice to export rejected tea was continued in the Tea Import Act of March 2, 1897, c. 358, § 6, 29 Stat. 606 (now contained in 21 U.S.C. § 47).

The "Imports and Exports" section of the Food and Drugs Act of 1906, Act of June 30, 1906, c. 3915, § 11, 34 Stat. 768, provided that adulterated or misbranded articles of food or drugs offered for import should be "refused admission, and the Secretary of the Treasury shall refuse delivery to the consignee and shall cause the destruction of any goods refused delivery which shall not be exported by the consignee within three months from the date of notice of such refusal * * *."

The foregoing acts and the present subsection, 381(a), (Act of June 25, 1938, c. 675 § 801, 52 Stat. 1058, as amended), represent a consistent policy as to the disposition of articles *refused* for import which allows the importer a choice of exporting those articles. A different policy was expressed by Congress as to *articles imported in violation of the law* in Act of August 30, 1890, c. 839, § 3, 26 Stat. 414. That act prohibited the importation of adulterated articles of food or drink, made the importation of such prohibited articles unlawful, and made any person who knowingly imported such articles subject, on conviction, to a fine not exceeding $1,000, and/or imprisonment for not more than one year, or both. The act provided as to the disposition of such unlawfully imported articles:

> "That any article designed for consumption as human food or drink, and any other article of the classes or description mentioned in this act, which shall be imported into the United States contrary to its provisions, shall be *forfeited* to the United States, * * * and such imported property so declared forfeited may be destroyed or returned to the importer for exportation from the United States after the payment of all costs and expenses, under such regulations as the Secretary of the Treasury may prescribe * * *."

Here the words "destroyed or returned to the importer for exportation" may well have given the Secretary of the Treasury discretion without regard to the choice of the importer. Other provisions of the act made clear that animals imported unlawfully could be destroyed. Section 6 of the act made it unlawful to import cattle, sheep and certain other animals which had been diseased or infected with any disease, or which had been exposed to such infection within sixty days next before their exportation, and the Secretary of Agriculture was authorized in Section 8 to slaughter all animals found in quarantine stations at places of entry to be infected with any contagious disease or to have been exposed to such disease, without regard to the time of exposure. It was provided

that the value of the animals so slaughtered as being so exposed to infection, but not infected, should be paid to the owner, *except that no payment should be made for animals imported in violation of the act.* (These provisions are now 21 U.S.C. §§ 103, 104.)

The general policy of Congress in regard to the disposition of property not meeting our standards for import as revealed by a study of its legislation regulating imports clearly appears to have been as follows:

(1) When the regulation has provided for determination of admissibility of articles offered for import, the owner or consignee has had a choice of exporting the refused articles, otherwise they would be destroyed;

(2) When the regulation has declared certain imports to be unlawful, the articles unlawfully imported were forfeited to the United States and could be destroyed or exported at the discretion of the agency, or, in the case of animals likely to spread contagious disease, they were to be destroyed;

(3) When health and welfare considerations required the destruction of property not imported unlawfully, the owner was paid the value of the imported property so destroyed.

There is nothing in 381(b) to indicate that the taking advantage of the opportunity to bring articles into compliance with standards for import makes those rejected from the compliance operation products involved in illegal import activity. Interpreting that statute as giving administrative discretion to destroy rejected articles would be a radical departure from the policy of Congress on this matter, and such a major change in policy could hardly be expected to appear as a parenthetical insertion in a statute. I find nothing from policy considerations to support the argument of defendants that Congress intended when a consignee elects to avail himself of the compliance provisions of 381(b) to deprive him of the choice under 381(a) to export rejected articles. From this viewpoint the contention of plaintiff that 381(a) and (b) should be read together, and that the parenthetical phrase regarding disposition of rejected articles in (b) was not intended to depart from the disposition provision of (a) and deprive the consignee of the choice of export is logical and persuasive.

The use of the words "destroyed or exported" in 381(b) does not necessarily indicate a grant of discretion to the Secretary as to destruction or export of rejected articles. The refused articles will also be "destroyed or exported" under 381(a), but under the precise wording therein the choice is to be made by the consignee. It is usual to refer to the disposition of refused articles under 381 (a) as "re-exported or destroyed", but this manner of reference could not be understood to imply that the consignee has no choice, or that the matter of disposition is one within the discretion of the Secretary. When the 1938 Food, Drug and Cosmetic Act was amended in 1949 to add the present 381(b), the Senate Report of the Committee on Interstate and Foreign Commerce recommending passage of the amendment described the disposition of refused articles under 381(a) as follows:

"Under Section 801 [381(a)] as it now stands, imports which are found to be inadmissible into the United States by reason of mislabeling, contamination, or for other reason must be either reexported or destroyed. * * *." 1949 U.S.Code Cong. Service, p. 2147.

In a letter to the chairman of the senate committee regarding the amendment, the Acting Secretary of Commerce wrote:

"Under section 801 [381(a)] of the existing law, imports which are found to be inadmissible into the United States by reason of mislabeling, contamination, or for other cause must be either reexported or destroyed. * *." Ibid. p. 2149.

The Food and Drug Administration in its Regulation prior to the enactment of 381(b) had used the following language

in connection with the disposition of refused articles under 381(a):

> "The notice of refusal of admission shall state that the article must be *exported or destroyed* under customs supervision within three months of the date thereof, as provided by law." Regulation § 2.308(b).

In a text on the law of foods, drugs and cosmetics the same disjunctive phrase is used to describe the disposition of refused articles under 381(a):

> "Under the 1938 Act as originally enacted, imports which were found to be inadmissible into the United States by reason of misbranding, contamination, or for other cause, were either *re-exported or destroyed*." 3 Toulmin, A Treatise on the Law of Foods, Drugs and Cosmetics (Anderson's 2d ed. 1963) § 41.12, p. 978.

The language in 381(b) therefore does not convey any greater meaning as to discretion than does the less than precise language usually used to describe the disposition of rejected articles in 381(a), which subsection admittedly gives the consignee the choice to export. The Court is convinced that nothing more was intended by the parenthetical expression "(including destruction or export of rejected articles or portions thereof, as may be specified in the Secretary's authorization)" than to make clear that the Secretary was empowered to authorize the disposition of rejected articles in his authorization permitting the articles to be brought into compliance. The Regulation of the Food and Drug Administration after the enactment of 381 (b) did not give it any more significance than this:

> "When authorization [to relabel or perform other action etc.] is granted, the chief of district shall notify the applicant in writing, specifying:
>
> "\* \* \*
>
> "(2) The disposition of the rejected articles or portions thereof; \* \* \*"

F.D.A. Regulation, § 1.320; 21 C.F.R. 1.320.

The only possible reason suggested by the defendants as to why the discretion as to the disposition of rejected articles should be greater under 381(b) than under 381(a) is that they have a duty to preserve the integrity of the food supply by assuring that adulterated foods shall "Not be stealthily put into" the stream of interstate commerce, ultimately winding up in the nation's food supply. They argue that one of the best ways to assure that this duty is met is to see that adulterated food, such as the bags of moldy coffee, skims, and sweepings here involved, are destroyed. If destroyed, the public is assured that those coffee beans will not become part of the nation's food supply.

There is nothing, however, to indicate that one of the purposes of the enactment of 381(b) was to increase the protection to or integrity of the nation's food supply. Prior to the 1949 amendment to the Food, Drug, and Cosmetic Act there had been a long standing practice of the Food and Drug Administration, without statutory sanction, of detaining articles offered for import which did not comply with the Act to allow them to be brought into compliance, and the Government had borne the expense of this practice. The purposes of the legislation were stated in the Senate Report as follows:

> "the purpose of this bill is, first to charge importers with the costs incurred by the Food and Drug Administration in supervising the relabeling or other operations on imported articles so as to bring them into compliance with the Federal Food, Drug, and Cosmetic Act, and, secondly, to provide express statutory authority for the long-standing administrative practice of releasing imported articles that do not comply with the requirements of the law so that they may be relabeled or given other appropriate treatment to bring them into compliance."

If there had been so important a purpose as a major change in policy as to the disposition of rejected articles, this Court is convinced that such a purpose would have been mentioned.

The Food and Drug Administration has apparently continued the practice provided for in its Regulations before the enactment of the 1949 amendment, 381 (b), without realizing that 381(b) rejected such practice. Under Regulation § 2.309, allowing relabeling or other act to bring articles into compliance with the Act, it was provided in section (b) thereof that the notice permitting such relabeling or other act

" * * * shall specify all conditions which must be fulfilled * * * in order to bring such article into compliance with the provisions of the Act including the *destruction*, under customs supervision, of all rejected material * * *."

The rejected material under the Regulation was routinely to be destroyed. This practice is apparently continuing. Mr. Dugas, who had been an import inspector for 4 years and an employee of the Food and Drug Administration for 9 years, testified that he knew of no instance in which rejected coffee had been exported. Mr. Sal E. Palmisano, Vice President of Dupuy Storage and Forwarding Corporation, testified that the Food and Drug Administration has them "automatically" to destroy the poor skims in the reconditioning process and such practice has never been protested. His company has an informal agreement with the agency about destruction.

The Court concludes that the defendants do not have the discretion under 381(b) to require the destruction of articles offered for import, which are rejected because they cannot be brought into compliance with the Act, without giving the applicant an opportunity to export the rejected articles upon compliance with the applicable statutes; therefore, the action in this case in refusing to grant the request for permission to export the rejected coffee, and in requiring its destruction as a condition of release of the sound coffee, was beyond their statutory authority. Judgment is rendered in accordance with these views granting to plaintiff the relief prayed for.