**DISTRICT 65, WHOLESALE, RETAIL, OFFICE AND PROCESSING UNION, et al., Plaintiffs,**

**v.**

**Richard M. NIXON, as President of the United States, et al., Defendants.**

**No. 71 Civ. 3347.**

United States District Court,
S. D. New York.

April 20, 1972.

**1194**

Donald Grody, New York City, for plaintiffs.

Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y. by Joseph D. Danas, Asst. U. S. Atty., for defendants.

OPINION

POLLACK, District Judge.

The issue on the merits presented by this lawsuit is whether in 1971 the President of the United States and the Council of Economic Advisors complied with the mandate of the Employment Act of 1946, 15 U.S.C. §§ 1021–1023, which requires that the Council advise and the President include in his Annual Economic Report to Congress a program implementing the policy declared in that Act. The plaintiffs contend that the President's 1971 Economic Report contained no such program;[1] they seek declaratory and injunctive relief against the President, the members of the Council of Economic Advisors and the Secretary of Labor.

The plaintiffs are a labor organization and certain individuals who allege representation of several classes of Americans who, the plaintiffs say, are adversely affected by the challenged Executive action or inaction. These classes are workers generally, veterans, blacks and young people, both employed and unemployed.

On this motion to dismiss, the defendants raise questions regarding jurisdiction, justiciability and sovereign immunity; they also reserve the question of whether class actions as alleged are maintainable under Rule 23(a) (4), Fed.R. Civ.P.

The Court holds that jurisdiction is conferred by 28 U.S.C. § 1337. *See* Murphy v. Colonial Savings and Loan Association, 388 F.2d 609, 614 (2d Cir. 1967) .(Friendly, J.); *see also* Cupo v. Community National Bank & Trust Company of New York, 438 F.2d 108 (2d Cir. 1971); Post v. Payton, 323 F.Supp. 799 (E.D.N.Y.1971). The other questions mentioned above are bound up with the general question of reviewability of a matter assigned to the discretion of the Executive, except for the Rule 23 prob-

1. On the oral argument, plaintiffs averred that this suit is not aimed at the present incumbent. Plaintiffs contended thereon that no President since the enactment of the Employment Act has complied with the Congressional mandate.

lem. Accordingly, the merits of plaintiffs' claims will be considered.

■ Plaintiffs rely heavily on the general rule that under a Rule 12 motion to dismiss the material allegations of the complaint must be taken as admitted. But plaintiffs invite inquiry of the 1971 Economic Report, nevertheless. In any event, that Economic Report may be judicially noticed for the purpose of determining whether any issues of material fact remain for trial or whether the Court may dispose of the case by summary judgment.[2]

Plaintiffs also assert that since issues of legislative history are involved, the disposition of this case on a Rule 12 motion is inappropriate. They contend that this motion does not provide the proper time or place to argue such issues "for such argument necessarily involves fact determination which cannot be disputed on a Rule 12 motion." However, the pertinent legislative history is substantial and accessible. The Court heard oral argument of significant duration on February 2, 1972, in which counsel turned quickly to the merits.

*The Setting and the Act*

Economic conditions at the end of World War II combined with a legacy of fear conferred by the Great Depression to produce the Employment Act of 1946; that combination is responsible for the breadth and ambiguity of the Act.

The country had not escaped overt inflation during the war. By the end of 1945 consumer prices were 31 percent, and wholesale prices 30 percent above their levels of six years earlier. Moreover, the inflationary pressures which had been repressed by wartime controls were very strong as the war ended; the private sectors had accumulated a huge

volume of liquid assets. L. Chandler, The Economics of Money and Banking 486 (5th Ed. 1969).

On the other hand, many feared that the decrease of government spending at the end of the war would bring disaster; this fear reflected forecasts of deep depression and widespread unemployment rather than inflation for the post-war period. *Id.*

In response to fears of mass unemployment, President Roosevelt set forth the necessity for "full employment" after the war in his Annual Message to Congress on January 6, 1945, indicating what a program of full employment would require. 91 Cong.Rec. 67 at 72–73 (1945). On January 22nd of that year, there was introduced in the Senate a bill, S. 380, to develop plans for such a program. The final version, entitled the "Employment Act of 1946", was approved by President Truman over a year later, February 20, 1946, amid protracted controversy.

A "Declaration of Policy" is set out in Section 2 of the Act, 15 U.S.C. § 1021:

> The Congress declares that it is the continuing policy and responsibility of the Federal Government to use all practicable means consistent with its needs and obligations and other essential considerations of national policy, with the assistance and cooperation of industry, agriculture, labor, and State and local governments, to coordinate and utilize all its plans, functions, and resources for the purpose of creating and maintaining, in a manner calculated to foster and promote free competitive enterprise and the general welfare, conditions under which there will be afforded useful employment opportunities, including self-employment, for those able, willing, and seeking to work, and to promote maximum employment, production, and purchasing power.

---

2. Rule 12(c), Fed.R.Civ.P.; 2A Moore's Federal Practice ¶ 12.15 at nn. 5, 14–18 (1968). *Compare* Gallaher & Speck, Inc.

v. Ford Motor Co., 226 F.2d 728 (9th Cir. 1955).

Section 3 of the Act, 15 U.S.C. § 1022, provides for the annual Economic Report of the President in part as follows:

(a) The President shall transmit to the Congress not later than January 20 of each year an economic report (hereinafter called the "Economic Report") setting forth (1) the levels of employment, production, and purchasing power obtaining in the United States and such levels needed to carry out the policy declared in section 1021 of this title; (2) current and foreseeable trends in the levels of employment, production, and purchasing power; (3) a review of the economic program of the Federal Government and a review of economic conditions affecting employment in the United States or any considerable portion thereof during the preceding year and of their effect upon employment, production, and purchasing power; and (4) a program for carrying out the policy declared in section 1021 of this title, together with such recommendations for legislation as he may deem necessary or desirable.

(b) The President may transmit from time to time to the Congress reports supplementary to the Economic Report, each of which shall include such supplementary or revised recommendations as he may deem necessary or desirable to achieve the policy declared in section 1021 of this title.

Section 4 of the Act created a Council of Economic Advisors to be made up of experts in the field of economics. Subsection (c) of Section 4 is of immediate concern to the issues herein:

(c) It shall be the duty and function of the Council—

(1) to assist and advise the President in the preparation of the Economic Report;

(2) to gather timely and authoritative information concerning economic developments and economic trends, both current and prospective, to analyze and interpret such information in the light of the policy declared in section 1021 of this title for the purpose of determining whether such developments and trends are interfering, or are likely to interfere, with the achievement of such policy, and to compile and submit to the President studies relating to such developments and trends;

(3) to appraise the various programs and activities of the Federal Government in the light of the policy declared in section 1021 of this title for the purpose of determining the extent to which such programs and activities are contributing, and the extent to which they are not contributing, to the achievement of such policy, and to make recommendations to the President with respect thereto;

(4) to develop and recommend to the President national economic policies to foster and promote free competitive enterprise, to avoid economic fluctuations or to diminish the effects thereof, and to maintain employment, production, and purchasing power;

(5) to make and furnish such studies, reports thereon, and recommendations with respect to matters of Federal economic policy and legislation as the President may request.

*Toward Maximum Employment, Production and Purchasing Power*

The plaintiffs contend in essence that the Employment Act requires a "full employment" program not limited by price stability considerations. They claim that the program described in the 1971 Economic Report "limits the maximization of employment at [as?] the cost of maintaining price stability" and that this defeats the purpose of the Act. They also claim that the 4½ percent unemployment goal described by the President in the 1971 Economic Report does not define

"full employment" within the meaning of the Act.[3]

Plaintiffs' view of the Act finds some support in the version of S. 380, entitled the "Full Employment Act of 1945", reported to the Senate on September 24, 1945 by the Committee on Banking and Currency.[4] On the questions of the meaning of the term "full employment" and the responsibility of the Federal Government for maintaining that condition, subsection (c) of Section 2 of the Senate version provided in part:

[T]he Federal Government has the responsibility to assure continuing full employment, that is, the existence at all times of sufficient employment opportunities for all Americans able to work and desiring to work.

Senate Report No. 583, S.Cal. No. 582, 79th Cong., 1st Sess. (1945), which accompanied the reference of the Senate version from committee to the Senate provided in part:

Only the assurance that there will be sustained full employment can overcome this fear [of unemployment and dwindling markets]. Pious phrases about "encouraging" or "promoting" full employment will not help. [p. 9]

The control of inflation, however, was linked to the full employment goal in Section 3 of the Senate version. That section, a predecessor to Section 3 of the Act, provided in general for a National Production and Employment Budget to be submitted by the President at the beginning of each regular congressional session. This section provided in part:

(a) [T]he National Production and Employment Budget . . . shall set forth—

.    .    .    .    .    .

(3) a general program, pursuant to section 2, for assuring continuing full employment, together with such legislation as he [the President] may deem necessary or desirable. Such program shall include whatever measures he may deem necessary to prevent inflationary or deflationary dislocations or monopolistic practices from interfering with the assurance of continuing full employment.

Whether this passage supports the thesis that under the Employment Act an interest in controlling inflation must always give way to that of assuring full employment wherever these interests conflict is not entirely free from doubt.[5] In support of plaintiffs' view, however, is the fact that nowhere else in the Senate version is the problem of the relevance of inflation mentioned. Moreover, in the Report which accompanies this version, there is the clear indication that "fundamental causes" of inflation, other than "fear of unemployment and depressions", are to be disregarded in the pursuit of full employment. S.Rep. No. 583 at p. 24.

The House of Representatives, however, rejected in large measure the Senate version of S. 380. The House version changed the title to the "Employment-Production Act"; it dropped the term "full employment" in favor of "high level employment"; and it added the objectives

3. The following passage from the 1971 Economic Report, H.R.Doc. No. 92–98, 92 Cong., 1st Sess., is set out with others in plaintiffs' complaint:

The general goal, which is more important than the precise numbers, is that the rate of unemployment should decline as fast as is consistent with a reasonably steady and durable decline in the rate of inflation. We believe that the numbers we have proposed—an unemployment rate in the 4½ percent zone and an inflation rate declining to approach the 3 percent range by mid-1972—are feasible representations of that goal.

4. The text of the Senate version as reported is set out at 91 Cong.Rec. 8917 (1945) and S.Rep. No. 583, S.Cal. No. 582, 79th Cong., 1st Sess., 81 (1945).

5. See e. g., the discussion on the floor of the Senate on September 27, 1945. 91 Cong.Rec. 9047–9061 (1945).

of promoting production and purchasing power.[6] Certain pious phrases, feared in the Senate, suddenly appeared.[7] In addition, the prevention and alleviation of inflation became an express objective of the required economic program, cut away, apparently, from the objective of high employment.[8] The House Report, H.R. Rep. 1334, 79th Cong., 1st Sess. (1945), stated in part:

> The committee substitute [the House version] further recognized that the slogan "full employment" is deceptive . . .—"full employment" never has been and never will be maintained under our system of free competitive enterprise except in wartime under huge deficits. High levels of employment, yes, but only if an atmosphere in which continued maximum utilization of our productive capacity can be achieved, with the resultant high levels of purchasing power. [p. 7]

The Senate, in its turn, rejected the House substitute.[9] The final version of S. 380 had to be hammered out during a month long conference. When that version appeared on February 5, 1946, the title of the bill had become the "Employment Act of 1946".[10] The final version dropped the terms "assure full employment" but it included the terms "promote maximum employment"; it dropped express reference to the goal of alleviating or preventing inflation but it added the goals of maximum production and purchasing power to that of maximum em-

ployment; it also discarded the limitation of adopting "sound fiscal policies", a code-word for budget balancing (discussed below), but it limited the attainment of the expressed goals to "all practicable means". Small wonder that when the final version was introduced on the floor of the House by Representative Manasco, one of the Conference Managers, he stated:

> Mr. Speaker, this is the first conference report I have ever seen where the proponents of two diametrically opposed views are in agreement that it is a good bill and that it meets the objectives of both their positions.

92 Cong.Rec. 976

*Executive Discretion: Goals*

■ In considering the language of the Act together with its legislative history, it becomes apparent that inflation-control considerations are to have some impact on the means employed to promote full or high employment. The question of the proper mix of anti-inflation and full employment measures remained, however, unresolved in the final version. This provides strong indication that this question was referred to the discretion of the President, as advised by his council of experts. The following language in Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 318, 78 S.Ct. 752, 757, 2 L.Ed.2d 788 (1958),[11] cited by defendants, seems particularly apt:

> But where the duty to act turns on matters of doubtful or highly debatable

6. The text of the House version is set out at 92 Cong.Rec. 975 (1946), and H.R. Rep.No.1334, 79th Cong., 1st Sess. 1 (1945).

7. *E. g.*, Section 2 (the policy statement): "[I]t is the continuing policy of the United States . . . to stimulate and promote employment . . . thereby aiding and assisting employables . . . to secure employment."

8. The House version, Sections 2(c), 3(d), 4(c) (7).

9. December 15, 1945. 91 Cong.Rec. 1204.

10. For the text in part see above at pp. 6–8. See the Conference Report, 92 Cong. Rec. 975 (1945); Statement of the [Con-

ference] Managers on the part of the House, *id.* at 976, 1946 U.S.Code Cong. Serv. 1067, 79th Cong., 2nd Sess.

11. In determining the question of the reviewability of toll rates by the Panama Canal Company, the Court construed Section 10 of the Administrative Procedure Act, 5 U.S.C. § 1009 (now 5 U.S.C. §§ 701–706) which excluded from the category of cases subject to judicial review "agency action" that is "by law committed to agency discretion". The Court held that the case before it was

> quite unlike the situation where a statute creates a duty to act and an equity court is asked to compel the agency to take the prescribed action.

inference from large or loose statutory terms, the very construction of the statute is a distinct and profound exercise of discretion. . . . We then must infer that the decision to act or not to act is left to the expertise of the agency burdened with the responsibility for decision.

■ The question of how "full" or "high" employment is to be defined, statistically or otherwise, is also left open by the Act. The view that this determination is left to the discretion of the Executive is expressly supported by the following passage from Section 3 of the Act, 15 U.S.C. § 1022:

The President shall transmit . . . an economic report setting forth (1) the levels of employment, production, and purchasing power obtaining in the United States and *such levels needed to carry out the policy declared in section 1021 of this title* [Section 2 of the Act]. [emphasis supplied]

■ A limit to this discretion appears throughout the legislative history, that is the massive unemployment levels which characterized the Great Depression.[12] Clearly a full employment goal of 4½ percent unemployment as fixed by the President in the 1971 Economic Report, is within such a limit.[13]

*Executive Discretion: The Program*

Regarding the program put forward in the 1971 Economic Report, as distinguished from its goals, the plaintiffs contend that it is not a program at all as far as the Act is concerned; that by putting forward the program described in the Economic Report "the President has silently renounced a statute of the United States". This alleged refusal to act, plaintiffs claim, is an abuse of discretion.

Preliminarily, the Court must consider whether plaintiffs' characterization of the issue is no more than a semantic device for avoiding a direct request that the Court delve into the wisdom of the President's program. The plaintiffs assure the Court that they do not urge such a course "for that would be a judicial usurpation of a right reserved to the people." In light of the following discussion, the Court will resolve this preliminary issue in plaintiffs' favor.

One approach to considering the issue of "nonaction" by the defendants, an approach which focuses the Court's primary attention again on the legislative history of the Act and away from the details of the 1971 Economic Report, is to consider the sorts of programs which the proponents of the House and Senate versions had in mind at the time of their consideration of S. 380 and to compare them in broad outline to the program included in the 1971 Economic Report.

Two issues were before Congress during 1945 and early 1946 with respect to a full or high employment program. One was whether deficit spending should remain as an available tool; the other was whether the full employment concept implied that the Federal Government should assume the position of employer of last resort.

The proponents of the Senate version of S. 380 resisted all attempts to forbid deficit spending where inflation and high unemployment conditions coincided. In the statement of policy contained in the Senate version, subsection (d) of Section 2 provided in part:

Such [full employment] program shall, among other things—

.   .   .   .   .   .

(4) to the extent that continuing full employment cannot otherwise be assured, provide such volume of Federal

---

12. *E. g.*, President's Annual Message, 91 Cong.Rec. at 72 (1945) ; S.Rep.No.583 at 3 (1945) ; H.R.Rep.No.1334 at 9 (1945).

13. See fn. 3 above.

investment and expenditure as may be needed, in addition to the investment and expenditure by private enterprises, consumers, and State and local governments, to assure continuing full employment.

The Senate Report, S.Rep.No.583, described one of the purposes of that passage as follows:

It serves notice that the Government will not allow any rigid mathematical formula on the balancing of the Federal Budget to interfere with its moral and legal commitment to assure continuing full employment. (p. 12)

On the other hand, the proponents of the House version opposed deficit spending during inflationary periods:

The [House] substitute further provides that in periods in which widespread unemployment exists or threatens, Government can stimulate private enterprise by (1) accelerating and expanding the normal public works of the Government, to be performed by private enterprise under contract and *to be consistent with a financially sound fiscal policy*; (2) encouraging the States to accelerate and expand their normal works programs; and (3) making available appropriate loans, thereby aiding and assisting employables to secure employment. *Conversely, it is contemplated that when inflationary conditions exist or threaten, the normal public works and other outlays will be reduced or suspended.* (H.R.Rep.No.1334 at p. 8)

[emphasis supplied]

Again, the final version of S. 380 does not resolve this aspect of the controversy. As noted above, the "sound fiscal policy" language contained in the House version was discarded, but "all practicable means" language took its place. This ambiguity implies the delegation of discretion.

■ Even if the Court were to resolve the question of ambiguity here in favor of the more liberal attitudes behind the Senate version, the program described in the 1971 Economic Report is clearly in compliance. In the area of fiscal policy, the President decided to "balance the budget at full employment", that is to spend an amount "equivalent to the revenues the economy would be generating at full capacity". The 1971 Economic Report expresses directly the expectation that such a program would involve a deficit in 1971 and "almost certainly" in 1972.[14]

The issue of whether a full employment policy ascribes the function of employer of last resort to the Federal Government appears to have been something of a red herring during the discussions of S. 380. By dropping the word "assure [full employment]" and replacing it with "promote", that pious phrase, the critics of the bill who relied on this issue were silenced. In any event, the plaintiffs do not assert that the lack of a guaranteed job opportunity program in the 1971 Economic Report constitutes a violation of the Act.

In sum, to the extent the Court should make inquiry into the details of the 1971 Economic Report, it does appear to contain a program as required by the Employment Act of 1946.[15]

14. President's Letter of Transmittal. 117 Cong.Rec. 1264 (1971) (H.R.Doc. No. 92–28).

15. Plaintiffs' allegations that the Employment Act of 1946 requires the President to make use of authority granted to the President subsequent to that Act, i. e. the Economic Stabilization Act of 1970, 12 U.S.C. § 1904, as amended, and the Credit Control Act, 12 U.S.C. § 1901 et seq., are without merit. Similarly, plaintiffs' claims concerning allegedly required employment measures directed at particular groups in the population are lacking in merit. The following from S.Rep.No. 583 at p. 8 is here appropriate.

The statutory enunciation of the right to employment [contained in the Senate version, see p. 9 above] does not imply

*Conclusion*

On the finding that the 1971 Economic Report does not constitute an abuse of the discretion conferred on defendants by the Employment Act of 1946, the Court holds that the challenged Executive action may not and on the facts should not be revised by the Court.[16] The remaining questions posed by defendants do not raise any matter for the further consideration of the Court.

The complaint is dismissed, with costs.

So ordered.

resort to the courts. The redress for individuals who feel they do not have opportunity to exercise this right is through action either to have their Government improve its economic program or to obtain an improved administration of the Government.

